[No. 55393-9. En Banc. May 3, 1990.]

THE STATE OF WASHINGTON, *Petitioner,* v. WILLIAM
ORR SWAN, ET AL, *Respondents.*

614

*Norm Maleng, Prosecuting Attorney, Cynthia S.C. Gannett, Senior Appellate Attorney,* and *Timothy Michael Blood, Susan Roe,* and *Donald J. Raz, Deputies,* for petitioner.

*Allen & Hansen, P.S.,* and *David Allen, Richard Hansen,* and *Donald Roistacher,* for respondents.

ANDERSEN, J.—

## FACTS OF CASE

The two defendants in this child abuse case were convicted at a jury trial in the Superior Court of the State of Washington for King County. The Court of Appeals reversed in an unpublished opinion.[1] We reverse the Court of Appeals and reinstate the judgments and sentences imposed by the trial court.

At issue here is whether there was sufficient corroborating evidence to justify the trial court allowing into evidence the hearsay statements of one of the two child victims in this statutory rape case. There is unfortunately no way at all to resolve this issue other than by going into the sad details of the abuse which the jury by its verdict found that the two defendants, husband and wife, had

---

[1]*State v. Swan,* 51 Wn. App. 1036 (1988). Defendants' attorneys at the trial court were not the same attorneys as represented them at the appellate court level.

inflicted on their own 3–year–old daughter and her 3–year–old playmate.

The defendants herein, William and Kathleen Swan, were each charged with two counts of statutory rape in November of 1985. The charges stemmed from statements made by their 3–year–old daughter, B.A., and her 3–year–old friend, R.T., to their day–care teachers and to a Child Protective Services (CPS) worker.

Before trial, the State gave notice of its intent to rely upon the child sexual abuse hearsay exception set forth in RCW 9A.44.120, Washington's child victim hearsay statute.[2] This statute, set forth in full in the margin,[3] creates an addition to the hearsay rule not included in the Rules of Evidence (ER) adopted by this court.[4] The trial court conducted pretrial hearings to determine B.A.'s and R.T.'s competency to testify at trial, found both girls incompetent to testify and admitted their earlier hearsay statements into evidence at the trial.

---

[2]As to what is and is not "hearsay" in the context of a child abuse case, *see In re Penelope B.*, 104 Wn.2d 643, 709 P.2d 1185 (1985).

[3]At all times pertinent herein, the child victim hearsay statute read as follows:
"A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings in the courts of the state of Washington if:
"(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
"(2) The child either:
"(a) Testifies at the proceedings; or
"(b) Is unavailable as a witness: *Provided,* That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
"A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement." RCW 9A.44.120.

[4]*Penelope B.*, 104 Wn.2d at 650.

At trial, whenever one of the girl's hearsay statements was about to be solicited from a witness, questioning was stopped by the trial court, the jury was excused and voir dire examination was conducted to determine the reliability of the statements. In each instance involved in this appeal, the trial court found the children's hearsay statements to be reliable and admitted them into evidence.

The jury found each defendant guilty of two counts of statutory rape, one count as to each victim. A defense motion for a new trial was denied, and each defendant was sentenced to 50 months in jail.

The defendants appealed, and the Court of Appeals reversed the convictions and remanded for a new trial because of the admission into evidence of R.T.'s hearsay statements. The Court of Appeals agreed that the girls' hearsay statements were reliable, but observed that the trial court had failed to consider whether the alleged abuse was corroborated by other evidence of sexual abuse as required by the child victim hearsay statute (RCW 9A.44-.120). After reviewing the record, the Court of Appeals found sufficient corroboration of B.A.'s abuse but insufficient corroboration of R.T.'s abuse. That court held that a new trial was necessary on both counts for each defendant.

After the State's motion for reconsideration was denied, the State sought discretionary review in this court. Review was deferred pending our opinion in *State v. Jones,* 112 Wn.2d 488, 772 P.2d 496 (1989). After the *Jones* opinion was filed, this court granted review of this case.

Although the principal issue before us is whether R.T.'s alleged abuse was sufficiently corroborated to render her hearsay statements admissible as evidence, 11 additional issues are also presented.

ISSUES

ISSUE ONE. Did the Court of Appeals err in finding insufficient corroboration of the alleged sexual abuse of R.T.?

ISSUE Two. Did the trial court err in declining to grant a new trial on the basis of evidence claimed to be newly discovered?

ISSUE THREE. Did the trial court err in finding the child R.T. incompetent to testify?

ISSUE FOUR. Did the trial court err in finding the children's hearsay statements reliable under the child victim hearsay statute (RCW 9A.44.120)?

ISSUE FIVE. Did the trial court err in permitting the State to call rebuttal witnesses?

ISSUE SIX. Did the trial court err in not allowing a psychologist to testify for the defense as an expert?

ISSUE SEVEN. Did the trial court make a constitutionally prohibited comment on the evidence?

ISSUE EIGHT. Did the trial court err in its ruling regarding defendant William Swan's explanation of his daughter's use of the word "potty"?

ISSUE NINE. Did the deputy prosecuting attorney commit reversible error during the course of the State's closing argument?

ISSUE TEN. Is this court's "manifest abuse of discretion" review standard unconstitutional?

ISSUE ELEVEN. Is RCW 9A.44.120, the child victim hearsay statute, unconstitutional?

ISSUE TWELVE. Did the State's alleged failure to disclose that one of the State's witnesses had been sexually molested violate due process?

## DECISION

ISSUE ONE.

CONCLUSION. After a careful consideration of the categories of allegedly corroborative evidence in this case, we conclude that there was indeed sufficient evidence before the trial court to support its determination that R.T.'s statements were admissible under Washington law. Accordingly, the Court of Appeals ruling to the contrary must be reversed.

■ Under Washington's child victim hearsay statute, RCW 9A.44.120, a child's description of an "act of sexual contact performed with or on the child by another" is admissible as hearsay evidence in a criminal proceeding if the statement provides "sufficient indicia of reliability" and, if the child is unavailable as a witness, "there is corroborative evidence of the act."[5] The Court of Appeals has defined corroborative evidence of the act as "'evidence of sufficient circumstances which would support a logical and reasonable inference'" that the act of abuse described in the hearsay statement occurred.[6] The child victim hearsay statute requires separate determinations of reliability and corroboration when the child is unavailable to testify.[7]

■ The determination of whether there is corroborative evidence of the act involves balancing the goal of making child victim hearsay more readily available as evidence against the concern that the use of such hearsay should not create too great a risk of an erroneous conviction.[8] As we recently explained, "[t]he Legislature has offered no specific guidance on how this balance is to be struck. Similarly, we feel it unwise to suggest any hard and fast rules. The determination must proceed case by case, . . . ."[9]

The most effective types of corroboration in such cases, of course, are eyewitness testimony, a confession or admissions by the accused, and medical or scientific testimony

---

[5]*State v. Jones,* 112 Wn.2d 488, 489–90, 772 P.2d 496 (1989) (citing RCW 9A.44.120).

[6]*State v. Hunt,* 48 Wn. App. 840, 849, 741 P.2d 566, *review denied,* 109 Wn.2d 1014 (1987) (citing *Bremerton v. Corbett,* 106 Wn.2d 569, 578–79, 723 P.2d 1135 (1986)).

[7]*State v. Ryan,* 103 Wn.2d 165, 174, 691 P.2d 197 (1984); *State v. Edmondson,* 43 Wn. App. 443, 453, 717 P.2d 784, *review denied,* 106 Wn.2d 1016 (1986).

[8]*Jones,* 112 Wn.2d at 495.

[9]*Jones,* 112 Wn.2d at 495.

documenting abuse.[10] In most cases of child sexual abuse, however, there is no direct physical or testimonial evidence.[11] The child victim is often the only eyewitness to the crime, and physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation.[12] Physical corroboration may also be unavailable because most children do not resist, either out of ignorance or out of respect for authority.[13] Consequently, in order to give any real effect to the child victim hearsay statute, the corroboration requirement must reasonably be held to include indirect evidence of abuse.[14] Such evidence has included a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence.[15]

There is no disagreement as to the fact that the trial court in this case did not separately determine that corroborative evidence of abuse existed before ruling that the hearsay statements were admissible. The State does, however, dispute the Court of Appeals conclusion that a search of the entire record revealed insufficient corroboration of R.T.'s abuse to render her hearsay statements admissible.

---

[10]*See* American Bar Ass'n, *The Corroboration of Sexual Victimization of Children*, Child Sexual Abuse and the Law, 103, 107 (5th ed. 1984); *Jones*, 112 Wn.2d at 495.

[11]*Penelope B.*, 104 Wn.2d at 647; *Jones*, 112 Wn.2d at 495; *Hunt*, 48 Wn. App. at 848.

[12]*Penelope B.*, 104 Wn.2d at 646–47; *Miller v. State*, 517 N.E.2d 64, 69 (Ind. 1987); *State v. Petry*, 524 N.E.2d 1293, 1300 (Ind. Ct. App. 1988).

[13]*Penelope B.*, 104 Wn.2d at 647; *Miller*, 517 N.E.2d at 69; *Petry*, 524 N.E.2d at 1300.

[14]*Jones*, 112 Wn.2d at 495; *Hunt*, 48 Wn. App. at 848; *State v. John Doe*, 105 Wn.2d 889, 897, 719 P.2d 554 (1986) (Utter, J., concurring).

[15]*See Jones*, 112 Wn.2d at 495–96; *see also State v. Allen*, 157 Ariz. 165, 177, 755 P.2d 1153 (1988).

The State argues that several categories of evidence provided sufficient corroboration of R.T.'s abuse. These categories, along with a description of the relevant testimony,[16] are analyzed separately in the pages of this opinion that follow.

PARALLEL DISCLOSURES BY THE CHILDREN

On October 2, 1985, 3–year–old B.A. walked out of a day–care center bathroom with her dress tucked in her tights. The center's teacher, Lisa Conradi, untucked the dress and told B.A. to keep her private parts covered. When B.A. appeared confused, Conradi explained that "private parts" means the areas covered by her bathing suit. B.A. pointed to her chest and crotch area. Conradi then added that no one should look at or touch B.A.'s private parts, whereupon B.A. said, "Uh–huh, Mommy and Daddy do." When asked "What do Mommy and Daddy do?", B.A. replied, "Mommy spits on me." Conradi asked where, and B.A. pointed to her crotch. At this point, Conradi gave B.A. a book and took the rest of the children downstairs. When Conradi returned, she asked B.A. if her parents did anything else to her private parts. B.A. said she spits on Mommy in her private parts and that Daddy "puts his potty in me and it hurts real bad." Conradi explained that a man's potty was a penis. The two then walked around the room. B.A. played peekaboo from behind a door with Conradi several times, and said, "My daddy plays peekaboo with me." She also said, "My daddy puts his penis in my mouth and icky milk comes out." When asked who else played this game, B.A. said Josh does. B.A. also said they played the games in the bedroom with their clothes off.

When Cindy Bratvold, the day–care owner, returned to the center a short while later, Conradi told her about B.A.'s statements. Bratvold then called Child Protective Services

---

[16]These descriptions include some testimony offered only during evidentiary hearings conducted in the jury's absence, as well as evidence ruled inadmissible, since we may consider all evidence in the record in assessing corroboration of claimed abuse. *See Jones,* at 493; ER 104(a).

(CPS). After calling CPS, Bratvold asked B.A. whether her close friend R.T., who attended the same day–care center, played games with B.A.'s parents. B.A. said "yes".

Two CPS caseworkers interviewed B.A. that day. B.A. would not answer questions they posed, but when Conradi asked in their presence if her mother spit on her or put her mouth on B.A.'s private parts, the child nodded and said "yes". The interview ended when the defendant Kathleen Swan came to take her daughter B.A. home. The CPS caseworkers then decided to interview R.T. and B.A. on October 4, when both girls were scheduled to be at the day–care center.

R.T. came to the center the following day, October 3, but B.A. did not. Bratvold took R.T. upstairs and began to talk to her. Bratvold started by asking R.T. if she liked certain people, including "B.A.'s mommy". R.T. liked the people listed and "kind of" liked Kathy Swan. When asked what she meant, R.T. said "she makes us play funny games." These games included exercise games and ring around the rosy in the nude and falling on the bed. "Then we kiss Kathy's boobies and we lick her potty, and she does that to us, too." R.T. also said that "Kathy puts—one time Kathy put something in my potty and made me bleed, and she cleaned it up and told me not to say anything."

R.T. then said she played games with "Uncle Bill" (the defendant William Swan). She said that Uncle Bill's favorite game was the happy birthday game. "And that's where he puts his peepee in my mouth and shakes it around, and then he says, 'Here is your happy birthday present,' and something icky gets in my mouth." R.T. also said that the Swans put candles and marbles in her "peepee". She added that another man, John or Josh, played the games.

The next day, a CPS caseworker came to the Bratvold day–care center to talk to the two girls. An initial attempt to interview them together proved unsuccessful, so the caseworker talked to the girls separately in Bratvold's presence. R.T. told the caseworker that she played "with a game of marbles" at the Swans' home. She then added,

"Bill plays without his clothes on. Bill touches my potty with his fingers." When asked what a "potty" was, R.T. said it was a "peepee hole". R.T. then said, "Kathy put some marbles in my bottom." When asked where her bottom was she said "peepee hole" and pointed to the vaginal area of an anatomically correct doll that the caseworker had brought. R.T. then added, "I am afraid . . . Kathy touches my potty. Blood was on my bottom. Kathy put something in my peepee hole. It hurt." She said there was blood "down there" and pointed to her crotch. She also said that she touched Kathy's "potty and boobies" and put her mouth on them. R.T. then said that B.A. was present, and added, "I am too afraid for it. I just hurt, she poked a marble in it, she just put a marble in it, in my potty." What happened? "Kathy fixed it."

Bratvold then asked R.T. about the happy birthday games. R.T. said, "Bill and Kathy put a candle in my potty and played happy birthday. Bill put marbles in my potty to make it better. Stuff comes out of his peepee." When asked if the "stuff" was like milk, water, or blood, R.T. replied, "Like milk." She added that "Bill gives me a happy birthday present, gives me one in my bottom." When asked if she liked Bill, R.T. said, "He is mean, I don't like him, he hurts me, he puts his peepee – –." R.T. pointed to the vagina on the doll when asked where Bill puts his peepee on her. "It hurt." R.T. added that B.A. played the marble and happy birthday games with the defendants.

The CPS caseworker then interviewed B.A. When asked if Mommy spits on her potty, B.A. replied, "Yes". When asked where Daddy puts his peepee, she said, "On my potty." When asked how it felt, she answered, "It hurts". B.A. said R.T. was present when these things happened, and she said that she played happy birthday and marble games with her mother and father, but she would not describe the games.

After the interviews, the police were called and the children were taken into protective custody. B.A. was placed in a foster home while R.T. was returned to her parents and

continued to attend Bratvold's day-care center. Two months later, R.T. told Bratvold she wanted to tell her something. "See my finger? I have a burn. I had a burn. . . . When Bill and Kathy lit the candle in my potty and I tried to grab it out, my finger got burned, and then I bumped my head on the counter when they made me lay on the counter." On October 17, 1985, after the alleged abuse came to light, R.T. spontaneously told her father that "Bill and Kathy are bad" because they put marbles in her bottom.

B.A.'s foster mother testified that while drying B.A. off after a bath, B.A. told her that her mommy and daddy put marbles in her potty. The foster mother asked her son for some toy marbles and asked B.A. if they were the type of marbles Daddy put in her potty. B.A. laughed and said no. When asked what kind of marbles Daddy used, B.A. pointed to her crotch. The foster mother then asked if the marbles were on Daddy's potty, and B.A. pointed to her crotch and said, "Yes, and a snake full of marbles." The foster mother also testified that B.A. had mentioned marbles on other occasions, and once had said that her daddy put marbles and other things inside her potty and then started to cry as she said this. The foster mother testified further that B.A. once brought up the subject of birthday candles in her potty.

Having outlined the parallel disclosures made by the children, we now turn to an analysis thereof to determine whether, as the State argues, these disclosures are corroborative evidence of the alleged abuse.

B.A. and R.T. did not have contact with each other on October 2 or 3, the days that they talked to the day-care workers. On October 4 they sat together but briefly before their separate interviews by the CPS caseworker.

Summarizing the similarities between the statements of these two 3-year-old children, we find the following. B.A. said that her daddy put "his potty in me", and R.T. said that he put his "peepee" in her. B.A. said that Daddy put his penis in her mouth and icky milk came out; R.T. said

Uncle Bill put his potty in her mouth and something icky, like milk, came out. B.A. said that she and her parents played games in the bedroom without clothes on; R.T. said that they played ring around the rosy in the nude, that Uncle Bill played without his clothes on, and that they fell on the bed after their games. B.A. said Josh also played the games, while R.T. said John or Josh played. B.A. said that her parents put marbles and birthday candles in her potty; R.T. said that the Swans put candles and marbles in her peepee and her bottom.

The Court of Appeals did not discuss these statements in detail before dismissing their corroborative value. The Court of Appeals held, "Certainly, to some degree, R.T.'s statements corroborate those of B.A. and to some degree B.A.'s statements corroborate those of R.T. However, under the circumstances of this case we do not believe that this corroborative evidence is, standing alone, sufficient to lead to the requisite 'logical and reasonable inference.'"

Recent cases from other jurisdictions have discussed "cross–corroboration" in greater detail and have used it to support the admission into evidence of child victims' hearsay statements. The statutory guidelines in those other jurisdictions, however, are not precisely the same as those set forth in Washington's child victim hearsay statute, RCW 9A.44.120.

The New York Court of Appeals found that three brothers' hearsay statements of abuse cross–corroborated each other in the second of two child protective proceedings reported in *In re Nicole V.*, 71 N.Y.2d 112, 518 N.E.2d 914, 524 N.Y.S.2d 19 (1987). The action underlying the second proceeding was governed by a civil statute providing that out–of–court statements may be corroborated by "'[a]ny other evidence tending to support'" their reliability.[17] Applying what it referred to as this "broad flexible rule", the court concluded that the statements of each brother

---

[17]*In re Nicole V.*, 71 N.Y.2d 112, 118, 518 N.E.2d 914, 524 N.Y.S.2d 19 (1987) (citing Family Court Act § 1046(a)(vi)).

tended to support the other's statements and, viewed together, gave sufficient indicia of reliability to each victim's out-of-court statements.[18] As the court there declared:

> Specifically, both Francis and David described an incident in which respondent had David put a "stick" into respondent's vagina while Francis looked on. Additionally, both Samuel and Francis described separate incidents where respondent came into each child's bedroom in the middle of the night and had sexual relations, hand to penis contact and mouth to penis contact, with each child after which she threatened each child not to tell anyone about the incidents. Because each child had consistently and independently described these particularly detailed sexual acts, the reliability of the victim's out-of-court statements could be weighed by comparing them.

*In re Nicole V.,* 71 N.Y.2d at 124. Thus, in this New York case the courts below properly found each victim's hearsay statements were sufficiently corroborated by the statements of the other victims to establish a prima facie case of sexual abuse.[19]

■ As noted earlier, our statute (RCW 9A.44.120) requires corroboration of the act of sexual abuse, and thus is less "broad and flexible" than the New York statute applied above. B.A. and R.T. did, however, consistently and independently describe similar sexual acts in varying degrees of detail. Using the logic and reasoning implicit in *In re Nicole V.,* the many parallels between the 3-year-old girls' statements in this case supply a reasonable inference that the abuse described by these young children did occur.

The Alaska Court of Appeals also used cross corroboration to allow admission of two child victims' hearsay statements into evidence in *Murray v. State,* 770 P.2d 1131 (Alaska Ct. App. 1989) and *Clifton v. State,* 758 P.2d 1279 (Alaska Ct. App. 1988). The Alaska statute applicable to both cases required additional evidence to corroborate a child victim's hearsay statements before they could be

---

[18]*Nicole V.,* 71 N.Y.2d at 124.

[19]*Nicole V.,* 71 N.Y.2d at 124.

admitted into evidence before a grand jury.[20] In *Murray,* a 5–year–old and her 9–year–old neighbor told their parents and a police officer that a family friend had sexually abused them. They described in detail sexual acts that they were subjected to and which they had witnessed being performed on each other. Despite lack of a confession or any medical or physical evidence, the court found the girls' charges corroborated in large part by each other's claims. The court cited *Clifton* in observing that "one child's claims of sexual abuse may corroborate another child's claim against the same individual."[21]

In the other Alaska case, *Clifton,* an 11–year–old boy and his 13–year–old sister told a social worker that their stepfather had sexually abused them, and then recanted their statements. In their original statements, the boy had described in detail ongoing acts of oral sex, while his sister said that the defendant had touched her sexually four or five times. At trial, the youngsters again denied their earlier charges, but admitted making earlier accusations of sexual abuse. The court concluded there that the original statements corroborated each other and were admissible as evidence.[22]

In the case before us, as in *Murray,* the girls described in some detail (R.T. more than B.A.) similar sexual acts and said that the other was present. The fact that the children in this case reported each other's presence, coupled with their parallel references to certain sexual practices, lends support to their claims of abuse. In *Clifton,* the children recanted their claims, while in *Murray* and the case at bar the children repeated the same basic stories of abuse. Indeed, weeks and even months after their allegations first came to light, both R.T. and B.A. independently indicated that the defendants had inserted marbles and birthday

---

[20]Alaska Stat. § 12.40.110.

[21]*Murray v. State,* 770 P.2d 1131, 1138 (Alaska Ct. App. 1989).

[22]*Clifton v. State,* 758 P.2d 1279, 1282 (Alaska Ct. App. 1988).

candles into their vaginas. Moreover, these consistent claims came from 3–year–olds, as opposed to the 5– to 13–year–olds involved in *Clifton* and *Murray*. We agree with the State that the likelihood that 3–year–old girls would fabricate this same story simultaneously, or that the girls would conspire to tell a continuing tale of sexual abuse about the parents of one of them, is remote. While *Clifton* and *Murray* required only corroboration of the statements, their acceptance of two victims' hearsay as mutually corroborative strengthens the State's contention in this case that the statements of R.T. and B.A. are corroborative of each other's abuse.

Tied to these parallel disclosures is the State's argument that the girls' eyewitness accounts of each other's abuse corroborates their abuse. Each girl simply said, however, that the other was present; neither described in detail what was seen to happen to the other. This is in contrast with *Murray*, where the 9–year–old said that she saw the defendant licking her 5–year–old friend's vaginal and breast areas and is also in contrast with *Nicole V.*, where the two boys described a specific act of abuse in which one participated.[23] Here, the bare statement that the other girl also played the games provides little corroboration of the alleged abuse.

## PRECOCIOUS SEXUAL KNOWLEDGE

Related to the girls' disclosures is the State's claim that their statements indicate precocious sexual knowledge that the girls could have learned only as the result of being abused.

 Such knowledge was demonstrated when a child victim described the act of urolagnia which she claimed that the defendant made her perform in *State v. Jones*, 112 Wn.2d 488, 491, 772 P.2d 496 (1989). There we found such "precocious knowledge" corroborative of the child's claim of abuse. We there said that the victim "has described and

---

[23]*See Murray*, 770 P.2d at 1133; *Nicole V.*, 71 N.Y.2d at 124.

demonstrated with particularity acts of sexual gratification that even the most imaginative adult might not conceive in a vacuum of personal experience."[24] Since the record revealed no other way in which the victim could have learned of such acts, her knowledge was held in *Jones* to be corroborative evidence of abuse.[25]

The defense argues here that day–care workers Conradi and Bratvold were predisposed to find child abuse and tainted the girls' memories by asking them questions about what B.A. had said before the CPS interviews began. It is true that Conradi did ask a few such questions which the girls did not answer. The key allegations by both girls, however, were made separately, spontaneously and repeatedly. While B.A. answered only leading questions posed by the CPS caseworker, she spoke freely to Conradi as well as to her foster mother. It is our view that this record does not support defendants' contention that witnesses Conradi and Bratvold supplied the children with the sexual knowledge they revealed.

A 5–year–old child's precocious sexual knowledge was held corroborative of her statements of abuse in the *Murray* case discussed above. In *Murray,* the child gave a detailed description of episodes of vaginal and anal penetration and fellatio, and spoke of a "milky substance" coming out of the defendant's penis.[26] The court placed "great emphasis" on the child's ability to describe the sexual contact with specificity:

> Given the child's age (five years at the time of the assault), we concluded that the maturity and accuracy of the detail in her description of the offense provided intrinsic assurance of the reliability of her statement.

*Murray,* 770 P.2d at 1138.

---

[24]*State v. Jones,* 112 Wn.2d 488, 497, 772 P.2d 496 (1989).

[25]*Jones,* 112 Wn.2d at 497.

[26]*Murray,* 770 P.2d at 1133–34.

Another child's description of ejaculation was also held to have corroborated her hearsay statements in the first proceeding reported in *In re Nicole V.,* 71 N.Y.2d 112, 518 N.E.2d 914, 524 N.Y.S.2d 19 (1987). In this proceeding, an expert testified that the victim's knowledge of sexual activity far beyond the norm for 3½–year–olds was a classic symptom of child abuse. The court observed that there was no other basis in reality for Nicole's statement of "white glue" or "paste" coming from her father's genital area or the placing of his penis in her vagina.[27]

In the present case, both victims described episodes of fellatio and ejaculation, as well as intercourse and possibly cunnilingus. While these acts are not as unusual as those described by the child victim in *Jones,* their accurate description by 3–year–old children indicates such precocious sexual knowledge that we consider it corroborative of abuse.

### B.A.'s Masturbatory Behavior

Witness Bratvold testified that B.A. masturbated constantly during her last 4 to 5 months at the day–care center, and one of Bratvold's employees testified that she had to repeatedly tell B.A. to keep her hands out of her pants. This behavior was not referred to by the Court of Appeals as corroborative evidence of abuse.

While the State argues here that such masturbation by this 3–year–old child demonstrates precocious sexual knowledge, the State deliberately did *not* offer testimony of its significance at trial. In making her offer of proof regarding a doctor's testimony about B.A.'s emotional reactions to two medical examinations, the deputy prosecuting attorney advised the trial court as follows:

> Your honor, at this point, the State, and it hopes to alleviate a lot of argument, is not asking Dr. Jenny to testify regarding masturbatory behavior, whether it's excessive on the part of a three–year–old or the sexual acting–out, the State is leaving

---

[27]*In re Nicole V.,* 71 N.Y.2d 112, 121–22, 518 N.E.2d 914, 524 N.Y.S.2d 19 (1987).

that alone. What we are asking her to testify at this point is the significance, if any, of this behavior during the exam.

The defense urges this court to consider expert commentary and cites a pediatric guide stating that "'[o]ccasional masturbation is a normal behavior of many infants and preschoolers.'"[28] We note that another expert sees frequent masturbation as a common reaction to sexual victimization.[29]

Even if such masturbatory behavior were to be viewed as partially corroborative of B.A.'s abuse, we fail to see how it might corroborate R.T.'s abuse. Arguably, it could perhaps be reasoned that if B.A. masturbated because she was abused, and if R.T. was present when B.A. was abused, then R.T. probably was abused too. It is most questionable, however, that this could reasonably be considered as corroborative evidence of R.T.'s abuse.

### THE UNUSUAL "GREETING" OF B.A. AND R.T.

This "greeting", performed more than once at the day–care center, consisted of the girls running up to each other, grabbing their crotches, and giggling. As stated above, the State intentionally did not offer expert testimony on the meaning of this "sexual acting out", presumably to avoid protracted argument. The Court of Appeals held that without such expert testimony, evidence of the "greeting" was useless as corroboration.

A child's sexualized behavior at her day–care facility was seen as corroborative by the court despite an expert's uncertainty in *State v. Hunt,* 48 Wn. App. 840, 741 P.2d 566, *review denied,* 109 Wn.2d 1014 (1987). Day–care employees testified in that case that the child took naps

---

[28]Response to Petition for Review, at 14.

[29]American Bar Ass'n, *The Corroboration of Sexual Victimization of Children,* Child Sexual Abuse and the Law, 103, 109 (5th ed. 1984), *cited in* Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations,* 98 Harv. L. Rev. 806, 821 n.99 (1985).

with two blankets bunched under her crotch and thighs to elevate her bottom, and then tucked her blankets between her legs and rocked herself to sleep. Employees also observed the child lying face down with her underpants down and a little boy rubbing her buttocks.[30] A psychologist testified that such conduct could indicate that the child had been exposed to adult sexuality and sexual abuse.[31] The trial court found the expert's testimony "very indefinite" but in its own judgment concluded that the child's behavior at the day–care facility met the corroboration requirement of RCW 9A.44.120.[32] The Court of Appeals also found the expert's assessment somewhat equivocal, but proceeded to find ample corroboration based on the child's behavior and other evidence in the case.[33]

Two recent Minnesota cases similarly considered abnormal and sexualized behavior as corroborative of children's hearsay statements regarding abuse. In *M.N.D. v. B.M.D.*, 356 N.W.2d 813, 816 (Minn. Ct. App. 1984), a psychologist testified that a child's behavior in inserting objects into her rectum was consistent with sexual abuse. In *D.A.H. v. G.A.H.*, 371 N.W.2d 1, 4 (Minn. Ct. App. 1985), the court found corroborative the child's fear of men as well as her behavior in grabbing at men's genital areas and having nightmares. In this Minnesota case, there was no mention of expert interpretation of such behavior.

▮ While experts may not be needed to label certain behavior as symptomatic of abuse, it would seem that the less obviously sexual the behavior, the more experts might be able to assist in interpreting that behavior. The "greeting" employed by B.A. and R.T. would not appear to be

---

[30]*State v. Hunt*, 48 Wn. App. 840, 841, 741 P.2d 566, *review denied*, 109 Wn.2d 1014 (1987).

[31]*Hunt*, 48 Wn. App. at 842.

[32]*Hunt*, 48 Wn. App. at 842–43.

[33]*Hunt*, 48 Wn. App. at 850.

strikingly abnormal, sexualized behavior. Without expert interpretation, it may be viewed as sexually oriented, but not as strongly corroborative of either girl's abuse.

## R.T.'s Behavior With an Anatomically Correct Doll

When the CPS caseworker interviewed R.T., she brought along an anatomically correct female doll. R.T.'s behavior with the doll consisted of pointing to the vagina of the doll when she said "peepee hole", and again pointing to the vagina of the doll when the caseworker asked her where Bill put his "peepee" on her. The Court of Appeals held that since there was no expert testimony in this case regarding behavioral characteristics that evince sexual abuse, there was nothing in the record to support the conclusion that R.T.'s behavior with the doll demonstrated unusual sexual awareness or constituted corroboration of abuse.

Here again, the question of whether expert testimony was necessary is raised. In *Hunt,* our Court of Appeals observed that much of the child victim's play with anatomically correct dolls was a combination of "'nonassertive verbal and nonverbal conduct'".[34] Testimony regarding such play was thus *not* hearsay and provided additional corroboration that the child had been abused.[35] In *Hunt,* the testimony regarding the child's play was unaccompanied by expert testimony. The play consisted of the child undressing a male doll and grabbing its penis, undressing a female doll, and placing the penis of the male doll between the female doll's legs.[36] Testimony regarding play with anatomically correct dolls also was viewed as corroborative without the benefit of expert testimony in *State v. Jones,* 112

---

[34]*Hunt,* 48 Wn. App. at 850 (citing *In re Penelope B.,* 104 Wn.2d 643, 655, 709 P.2d 1185 (1985)).

[35]*Hunt,* 48 Wn. App. at 850; *Penelope B.,* 104 Wn.2d at 654–55.

[36]*Hunt,* 48 Wn. App. at 842.

Wn.2d 488, 772 P.2d 496 (1989). In *Jones,* the play demonstrated the abusive act of urolagnia.[37]

In two cases from other jurisdictions, a child victim's play with anatomically correct dolls also was seen as corroborative without the aid of expert testimony. In *Murray,* the child put the penis of a male doll between the legs of a female doll, in its mouth, and in its rectal area.[38] Another child demonstrated with dolls that her father had touched her genital area in *In re Dutchess Cy. Dep't of Social Servs. ex rel. Kerri K.,* 135 A.D.2d 631, 633, 522 N.Y.S.2d 210 (1987).

■ It thus appears to us that R.T.'s play may be considered on its own merits, without the benefit of expert interpretation. Her play with the female doll was not nearly as explicit as the 2–doll play described in *Jones, Hunt,* and *Murray,* but is equivalent to that described in *Kerri K.* As such, it serves as at least some corroboration of R.T.'s abuse.

R.T.'s COMPLAINTS OF PAIN

R.T.'s father testified that during the summer of 1985, and up to the beginning of September 1985, R.T. occasionally complained that her bottom was very sore while doubling over and putting her hands on her crotch. The Court of Appeals rejected this evidence as having any significance on the basis that it was medically unsubstantiated and because the complaints "occurred months after the abuse allegedly occurred and ceased 1 month before the allegations came to light."

We agree that it is clear that R.T.'s complaints ceased 1 month before the allegations came to light in early October. Less clear, however, is the timing of the alleged abuse. R.T.'s father testified that the defendants baby–sat R.T. a couple of times a month during 1985. The only time he could recall the defendant William Swan being there was

---

[37]*State v. Jones,* 112 Wn.2d 488, 491, 772 P.2d 496 (1989).

[38]*Murray v. State,* 770 P.2d 1131, 1134 (Alaska Ct. App. 1989).

when R.T. spent the night with the defendants in January 1985. The defendant Kathy Swan testified that she baby-sat R.T. only five or six times between January and October 1985. Both defendants testified that the only time R.T. was with William Swan in her parents' absence was on the January night she spent with the defendants.

■ If the defendants' testimony is believed, R.T. could have been sexually assaulted by William Swan only on that January night, well before her complaints of pain began. She had more chances at a later time to be assaulted by Kathy Swan, however, according to both her father and Kathy Swan. The information which was filed in this case charged the defendants with raping the girls between January and October 1985. Thus, the timing of the alleged abuse does not appear to us to be as certain as the Court of Appeals seemed to indicate. It is true that the complaints were not medically substantiated, but according to at least one authority, psychosomatic complaints about pain in the genitals or buttocks may be a symptom of sexual victimization.[39] We thus conclude that R.T.'s complaints did provide some degree of corroboration of sexual abuse.

PHYSICAL AND EMOTIONAL CORROBORATION
OF B.A.'S ABUSE

This category of evidence includes testimony regarding B.A.'s two medical examinations and the views of an expert witness regarding those examinations.

Thomas Ritter, a nurse practitioner, examined B.A. on October 7, 1985. He was asked to check out her coughing and also to examine her for signs of sexual abuse. B.A. became very distraught when Ritter told her he wanted to do a genital examination. She clung to her foster mother and said repeatedly, "Please don't hurt me." When she finally agreed to be examined, she wouldn't let Ritter completely remove her underpants. She then assumed a position that Ritter said he had never seen in his 4 years of

---

[39]American Bar Ass'n, *The Corroboration of Sexual Victimization of Children,* Child Sexual Abuse and the Law, 103, 109 (5th ed. 1984).

practice with children. She lay on her back, drew her knees up to her chest, and put her arms around her knees, thus leaving her genitalia and buttocks exposed. She was crying at the time and intermittently attempted to guard her genitalia by putting her hand between her legs. Ritter also found that the inside of the labia contained blood vessels that were more dilated than usual, and saw that the area around the introitus (the opening of the vagina) was reddened. He estimated the size of the introitus to be 1 to 1.2 centimeters. During the examination, Ritter did not check on whether a hymen was present, but he was able to see into B.A.'s vagina. After the examination, B.A. asked Ritter two or three times not to take any pictures of her, and was overall very distraught.

On October 9, 1985, the Swans' family physician, Dr. Lawrence Parris, examined B.A. at the request of CPS. Dr. Parris testified that B.A. was very fearful and didn't want her underpants pulled down. Dr. Parris observed that the vaginal introitus was slightly red, and noticed a slight discharge. He did not note whether the hymen was intact. He found no definite evidence of physical injury, but recommended that B.A. be evaluated at a sexual assault center because of her fearfulness.

Dr. Carol Jenny, Medical Director of the Sexual Assault Center at Harborview Medical Center, was accepted by the court as an expert on sexual abuse of children, and testified about her observations regarding the Ritter and Parris findings. Dr. Jenny testified that an introitus of 1 to 1.2 centimeters is abnormally large for a 3–year–old (the normal size is .4 cm). She noted that Ritter's ability to see the tissue inside the vagina indicated that he could see through the hymenal opening, even though neither Ritter nor Dr. Parris specifically recorded the presence or absence of a hymen. She also observed that it is unusual to find a vaginal discharge in a child, and such a discharge might result from infection caused by sexually transmitted disease. In assessing her testimony, the Court of Appeals considered Dr. Jenny's opinion, which had been ruled

inadmissible by the trial court,[40] that B.A.'s fearfulness during the examination was probably a sign of sexual abuse.

There was no medical evidence to document R.T.'s claims of abuse. A physician examined her on October 5, 1985 and found no signs of physical trauma.

■ Medical evidence similar to that regarding B.A. was considered corroborative of abuse in *State v. Gitchel*, 41 Wn. App. 820, 706 P.2d 1091, *review denied*, 105 Wn.2d 1003 (1985). Such evidence in *Gitchel* included a doctor's finding of partial vaginal penetration and the child's inappropriate behavior during the medical examination.[41] The New York Supreme Court also concluded that redness in a child's genital area partially corroborated her allegations of abuse in *Kerri K.*, 135 A.D.2d at 633.

We thus observe in this case, as did the Court of Appeals, that the medical evidence regarding B.A. is sufficient to permit a logical and reasonable inference that she was abused. Whether that evidence corroborates R.T.'s abuse is another matter. Strictly speaking, B.A.'s physical and emotional status during the examinations does not establish that R.T. was assaulted. B.A.'s physical and emotional conditions do lend at least some measure of support, however, to R.T.'s statements that B.A. played the games with her parents and, accordingly, that R.T. was present and was abused as well.

IN CONCLUSION AS TO THE CORROBORATION ISSUE

The strongest corroboration of R.T.'s abuse lies in the parallel disclosures of abuse that she and B.A. made, and in the precocious sexual knowledge that the disclosures reveal. Somewhat corroborative is her play with the anatomically correct doll and her complaints of pain. While the girls'

---

[40]*See Jones*, 112 Wn.2d at 493; ER 104(a).

[41]*State v. Gitchel*, 41 Wn. App. 820, 828, 706 P.2d 1091, *review denied*, 105 Wn.2d 1003 (1985).

unusual greeting demonstrates some appreciation of sexuality, we do not perceive it as strongly corroborative of the claimed abuse. Even less corroborative of R.T.'s abuse, standing alone, is B.A.'s masturbatory conduct and the physical and emotional evidence of her abuse. Viewed together, however, the corroborative value of these pieces of evidence is strengthened. As we declared in *State v. Jones*, 112 Wn.2d 488, 772 P.2d 496 (1989), "the determination of corroboration under RCW 9A.44.120 [the child victim hearsay statute] requires an evaluation of the particular circumstances that obtain in each case."[42] It is more than merely arguable that the contemporaneous circumstances of this case—the girls' parallel disclosures, sexual knowledge and greeting, R.T.'s complaints of pain and play with the doll, B.A.'s masturbation and the medical and emotional evidence of her abuse—lead to a reasonable inference that both girls were sexually abused. As we also made clear in *Jones,* the essential purposes of the child victim hearsay statute "should not be defeated by a stubborn insistence on corroboration that is impossible to obtain."[43] While there is no direct evidence of abuse in this case, the various items of indirect evidence stemming from the words and behavior of these two 3–year–old children together constitute sufficient corroboration of abuse to render each child's hearsay statements admissible in evidence.

Issue Two.

Conclusion. The well–established criteria for granting a new trial on the basis of newly discovered evidence were not met in this case; the trial court did not abuse its discretion by denying the defendants' motion for a new trial on that basis.

■ ■ A new trial will not be granted on the ground of newly discovered evidence unless the moving party demonstrates that the evidence (1) will probably change the result

---

[42]*Jones,* 112 Wn.2d at 498.

[43]*Jones,* 112 Wn.2d at 496.

of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.[44] The absence of any one of these five factors justifies denial of a new trial.[45] Furthermore, the granting of a new trial for newly discovered evidence rests within the sound discretion of the trial court, and a denial will not be reversed except for an abuse of that discretion.[46]

After the defendants in this case were found guilty by a jury, they filed a motion for a new trial. This motion was based on three categories of newly discovered evidence, two of which dealt with defendants' claim that Lisa Conradi was "obsessed" with child abuse. One evidentiary category consisted of statements made by Conradi, the teacher at R.T.'s and B.A.'s day–care center, to a reporter who was also, apparently unbeknownst to Conradi, an investigator for the defendants. These statements described Conradi's own sexual abuse as a child and her previous problems with drugs and alcohol. The second category consisted of prior false reports of child abuse allegedly made by Conradi to CPS. The third category was defense counsel's discovery that a boy named Josh attended the same day–care center as R.T. and B.A., the girls having each testified that a "John" or "Josh" played sexual games with them and B.A.'s parents.

The trial court denied the motion for a new trial, concluding that the presence of a Josh in the day–care center was something that was clearly discoverable in advance of trial. With regard to Conradi, the court described her

---

[44]*State v. Williams*, 96 Wn.2d 215, 222–23, 634 P.2d 868 (1981); *State v. Franks*, 74 Wn.2d 413, 418, 445 P.2d 200 (1968).

[45]*Williams*, 96 Wn.2d at 223; *see also Franks*, 74 Wn.2d at 418.

[46]*State v. Wilson*, 71 Wn.2d 895, 899, 431 P.2d 221 (1967); *State v. Hobbs*, 13 Wn. App. 866, 869, 538 P.2d 838, *review denied*, 85 Wn.2d 1019 (1975); *see also State v. Barry*, 25 Wn. App. 751, 757, 611 P.2d 1262 (1980).

statement to the reporter as "typical puffery". More importantly, the court found no facts in the statement that differed from those to which Conradi testified at trial. The trial court observed further that "there is no new evidence in the statement with respect to her interest or concerns which Defense now characterizes as obsession [with] child abuse." The witness Conradi's problems were not properly characterized as newly discovered evidence. "Conradi was investigated and investigated before trial. There is no showing before the Court that this information was not available." The trial court also found no evidence to support the claim that Conradi previously made false reports of child abuse to CPS.

In its ruling, the trial court reminded counsel of the requirements for granting a new trial:

> The Court is mindful that the proffered evidence should be such that results would probably change. It is not correct that the statements of Conradi were the State's case. The State had overwhelming evidence, her medical evidence, behavior evidence, and statements not only to Conradi but consistent statements to others—CPS workers, [the foster mother], I believe to Bratvold. I believe due diligence would have discovered the evidence which is characterised [sic] here as new evidence. Most of it is merely impeaching. The requirements, therefore, for the granting of a new trial are not met.

We agree with the trial court that the new evidence regarding Conradi was merely impeaching. At trial Conradi testified directly and on cross examination about classes in child abuse that she took and about the abuse of her two sons. On cross, she was asked about a prior statement that child abuse was everywhere, and she replied that "[i]t's just about in every state, every city, every public school." During closing argument, the defense referred to the abuse of Conradi's children as well as her expectations of child abuse allegedly fostered in part by Cindy Bratvold, the day-care owner. Defense counsel argued that Conradi brought her educational and personal experiences with her as well as "her idea that sexual abuse is everywhere, and it's as prevalent as behavior problems with children." Thus, the claim

that Conradi was "obsessed" with child abuse, to use defendants' argumentative phraseology, was clearly before the jury at trial, and any new evidence in that regard was at most cumulative impeaching evidence.

We also agree with the trial court's conclusion that the claimed "new evidence" was discoverable before trial. No contention has been made that the names of the children at the day–care center could not have been discovered before trial had anyone sought to check. The defense contends on appeal that the State knew of witness Conradi's prior sexual abuse before trial, but there is no evidence in the record to support this contention. (This same contention is again raised in connection with Issue Twelve.) No showing was made before the trial court that the information about Conradi's own abuse was not available before trial.

Moreover, the trial court's statement that this newly discovered evidence would not have changed the outcome of the trial is also sustainable. The identity of Josh as a playmate would have challenged only one relatively minor detail in the girls' statements describing their abuse, and while the evidence regarding Conradi arguably could have added some weight to the defense efforts to impeach her credibility, it would not have affected the rest of the State's case, which included several other witnesses and several repetitions of the same type of statements by the two children disclosed in Conradi's testimony.

Since the "newly discovered" evidence would probably not have changed the outcome of the trial, could have been discovered before trial, and was both cumulative and impeaching, the trial court did not abuse its discretion in denying the motion for a new trial. In sum, we conclude here, as this court has previously concluded, that

> each new trial inevitably leaves new avenues for investigating the facts anew. Hardly a case can be supposed but what, by diligent search, some additional evidence will be found that would, if offered at trial, have been admissible on one theory or another. The mere existence of such evidence does not alone justify the granting of a new trial.

*State v. Williams*, 96 Wn.2d 215, 224, 634 P.2d 868 (1981).

ISSUE THREE.

CONCLUSION. The trial court did not abuse its discretion by finding that R.T. was incompetent to be a witness in this case.

Under the child victim hearsay statute, RCW 9A.44.120, a child's description of sexual abuse is admissible as evidence if the statements are reliable and if the child either testifies or is unavailable as a witness. In the case before us, both B.A. and R.T. were unavailable because the trial court found them both incompetent to testify. The defense challenges only the conclusion that one of the children, R.T., was incompetent.

 This court has declared that the test of the competency of a young child as a witness consists of the following: (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he or she is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his or her memory of the occurrence; and (5) the capacity to understand simple questions about it.[47] The determination of competency rests

> primarily with the trial judge who sees the witness, notices his manner, and considers his capacity and intelligence. These are matters that are not reflected in the written record for appellate review. Their determination lies within the sound discretion of the trial judge and will not be disturbed on appeal in the absence of proof of a manifest abuse of discretion.

*State v. Allen,* 70 Wn.2d 690, 692, 424 P.2d 1021 (1967); *see also State v. Griffith,* 45 Wn. App. 728, 733, 727 P.2d 247 (1986).

At the competency hearing, defense counsel asked R.T. no questions and made no argument regarding her competency despite being invited to do so. Nor did the defense object to her being found incompetent to testify. The

---

[47]*State v. Allen,* 70 Wn.2d 690, 692, 424 P.2d 1021 (1967); *State v. Tuffree,* 35 Wn. App. 243, 248, 666 P.2d 912, *review denied,* 100 Wn.2d 1015 (1983).

defense now contends, however, that the questioning by the court and the prosecutor was insufficient to make the necessary determination of whether the child was competent to testify. Arguably, the competency issue can be raised for the first time on appeal on the basis that the showing of unavailability is constitutionally mandated when the declarant witness, whose testimony is to be used against the defendant, is not produced.[48]

Turning to the competency hearing, R.T. said that her birthday was in "higher June". She also said she had been in the courtroom 40 times (she had never been there before) and that it was Saturday, although it was not. When asked if she recognized anyone, she pointed to defense counsel and said she had seen him 4 days ago, which she had not. She did not say that she recognized her father or the defendants, who also were in the courtroom. When the court asked R.T. if she knew the difference between the truth and a lie, R.T. said "not telling the truth" is telling a lie. The court then asked R.T. if it would be the truth or a lie if she said she was wearing a pink dress. Though her dress was pink, R.T. said it would be a lie because her dress was long. R.T. then said her dress was "blue, sort of, but it's pink." The court excused R.T. and found her incompetent to testify on the basis she did not understand the obligation to tell the truth on the witness stand and because she did not have a sufficient memory to speak truly about past events. The court added that there were "several problems" with R.T.'s answers:

> I don't know whether it was the question asked, her understanding or her memory, but it was quite clear that she was not able to answer the questions put to her. On that basis, she is not a competent witness and the court will find her unavailable for the purposes of the statute.

The Court of Appeals reviewed the competency issue and upheld the trial court's findings of incompetency:

---

[48]*See State v. Griffith*, 45 Wn. App. 728, 732 n.1, 727 P.2d 247 (1986) (citing *Barber v. Page*, 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968)).

B.A. refused to answer any questions and was properly determined to be incompetent to testify. While R.T. was responsive to questions, the court found R.T. incompetent on two grounds: (1) R.T.'s inability to understand the obligation to tell the truth, and (2) her ability to remember accurately and express past events. The record demonstrates that there was no abuse of discretion on the part of the trial court in finding R.T. incompetent to testify.

The defense now contends that the trial court should have asked R.T. questions about her alleged sexual abuse in determining her competency to testify. Since at the time the child was put on the witness stand she did not know the day of the week, the color of her dress, or recognize her father and the defendants, questions about her alleged abuse were unnecessary to determine her competence to testify.

ISSUE FOUR.

CONCLUSION. The trial court did not abuse its discretion in finding both girls' hearsay statements reliable.

Before a child's hearsay statements are admissible under the child victim hearsay statute, RCW 9A.44.120, the court must find "that the time, content, and circumstances of the statement provide sufficient indicia of reliability".[49]

■■■ This court listed nine factors to be applied in determining whether a child's out–of–court statements are reliable in *State v. Ryan,* 103 Wn.2d 165, 175–76, 691 P.2d 197 (1984). The first five, derived from *State v. Parris,* 98 Wn.2d 140, 146, 654 P.2d 77 (1982), include "'(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness.'"[50]

---

[49]RCW 9A.44.120(1); *State v. John Doe,* 105 Wn.2d 889, 896, 719 P.2d 554 (1986).

[50]*State v. Ryan,* 103 Wn.2d 165, 175–76, 691 P.2d 197 (1984) (quoting *State v. Parris,* 98 Wn.2d 140, 146, 654 P.2d 77 (1982)).

The next four factors to be considered, derived from *Dutton v. Evans,* 400 U.S. 74, 88–89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970), are (1) the statement contains no express assertions about past fact; (2) cross examination could not show the declarant's lack of knowledge; (3) the possibility of the declarant's faulty recollection is remote; and (4) the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented defendant's involvement.[51]

▮▮▮ In short, reliability does not depend on whether the child is competent to take the witness stand, but on whether the comments and circumstances surrounding the statement indicate it to be reliable.[52] The trial court is necessarily vested with considerable discretion in evaluating the indicia of reliability.[53]

The Court of Appeals concluded that the trial court's findings of reliability in this case did not constitute an abuse of discretion. As that court observed, the trial court's rulings regarding the hearsay statements demonstrated careful consideration of the *Ryan* factors.

With regard to the five *Parris* factors listed in *Ryan,* the trial court observed that neither child had a motive to lie. There was testimony that B.A. had a good relationship with her parents and that R.T. enjoyed playing with B.A. at the defendants' home. With regard to the girls' general character, the testimony revealed that both children had a reputation for truthfulness. In two other child abuse cases, the courts found that the child victim's explicit descriptions of abuse made the possibility of fabrication unlikely. "'A young child is unlikely to fabricate a graphic account of sexual activity because such activity is beyond the realm of

[51]*Ryan,* 103 Wn.2d at 176.

[52]*John Doe,* 105 Wn.2d at 896; *Griffith,* 45 Wn. App. at 733.

[53]*State v. Madison,* 53 Wn. App. 754, 759, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989); *see also State v. Frey,* 43 Wn. App. 605, 611, 718 P.2d 846 (1986).

[her] experience.'"[54] In this case, both B.A. and R.T. described in specific terms various sexual acts. The trial court also found reliability in their use of age–appropriate language and responses when describing those acts.

The trial court discussed in some detail whether the girls' statements were made spontaneously. The trial court did not accept the defense argument that Conradi's expectation of child abuse created B.A.'s claims of abuse. The trial court correctly observed that Conradi's method of questioning B.A. was open–ended and that most of B.A.'s statements were spontaneous and not even responses to questions. In another case, questioning similar to that by the witness Conradi led to the charge that the child's responses were not spontaneous.[55] This was in *State v. Madison*, 53 Wn. App. 754, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989), wherein a foster mother who suspected that her ward had been abused read to the child from a book on human reproduction and asked if anyone had touched her. The child then described acts of intercourse and oral sex to which she had been subjected. The Court of Appeals agreed that while the setting was not spontaneous,

> the details of the event and the identity of the defendant were not suggested and were "spontaneously" volunteered. Indeed, the foster mother testified that she was "a little stunned" by the child's accusation.

*Madison*, 53 Wn. App. at 759. Here, too, the witness Conradi's statement that B.A. should cover her private parts in no way suggested the details and identities that B.A. subsequently volunteered. R.T.'s statements to witness Bratvold were made spontaneously, as were most of her comments to the CPS caseworker. The court also accepted

---

[54]*See* Comment, *The Sexually Abused Infant Hearsay Exception: A Constitutional Analysis,* 8 J. Juv. L. 59, 67 (1984), *cited in Frey,* 43 Wn. App. at 610; *State v. Gitchel,* 41 Wn. App. 820, 827, 706 P.2d 1091, *review denied,* 105 Wn.2d 1003 (1985).

[55]*Madison,* 53 Wn. App. at 759.

the reliability of her answers to direct questions from the CPS caseworker, observing,

> I don't believe it's the purpose of the indicia of reliability to eliminate from evidence all statements of children which are offered in response to questions of children. That would be, it seems to me, eliminating all possibility of an interview of a child resulting in admissible evidence.

The trial court expanded on this thought in discussing the reliability of B.A.'s responses to the caseworker, which were largely answers to leading questions:

> With respect to B.A., it seems to me the issue comes down to whether or not leading questions of a difficult child witness render the ultimate statements of the child unreliable. In this circumstance where there is other corroboration, where the same statements or similar statements were made by the child in response to open–ended questions and in a much more spontaneous context, it seems to me it does not. Quite clearly it does not.

With regard to the remaining *Parris* factors indicating reliability, the trial court observed that more than one person heard similar stories of abuse from the girls. The court also found that the timing of the girls' declarations indicated reliability, since they were volunteered as soon as the topic was broached and since the girls made the similar statements on two consecutive days without discussing the matter between themselves. With regard to the relationship of the declarant and the witness, the court observed that witnesses Conradi and Bratvold had a relationship of trust with the girls since they taught at and operated the girls' day–care center. Both were present when the CPS caseworker interviewed the girls, indicating that people were present who were trusted by the child in each case. B.A.'s foster mother and R.T.'s father also were undoubtedly trusted by the children.

Turning to the four *Dutton* factors cited in *Ryan,* the girls' statements contained express assertions about past fact, but as we recently noted, child hearsay statements about sexual abuse will usually contain statements about

past fact.[56] That factor weighed neither in favor of reliability nor unreliability in *State v. Leavitt,* 111 Wn.2d 66, 75, 758 P.2d 982 (1988). However, R.T.'s complaints of pain in her bottom describe a present state. With regard to the second *Dutton* factor, it is doubtful whether cross examination could have shown either child's lack of knowledge. During the competency hearing, B.A. was unable to speak, while R.T. could not respond appropriately to questions in a courtroom setting. This is similar to the situation before the Court of Appeals when it assessed the reliability of a 3–year–old's hearsay statements in *State v. Gitchel,* 41 Wn. App. 820, 828, 706 P.2d 1091, *review denied,* 105 Wn.2d 1003 (1985): "cross examination would not have shown R's lack of knowledge under these circumstances, as R demonstrated that she did not respond to questions in a courtroom setting." As the Court of Appeals explained in *Gitchel,* even if R were capable of being cross–examined, the number of times she described her abuse tended to establish that R's description of what occurred was credible.[57] The same could be said here. The girls' repetition of similar and unusual details of abuse tends to establish that their descriptions were credible even absent cross examination.

The trial court did not directly address the *Dutton* factor of whether the possibility of the declarant's faulty recollection is remote. In *Leavitt,* we observed that because the child's statements to a social worker were made soon after the event and were consistent with statements made to her aunt and mother, the possibility that she was speaking from faulty recollection was remote.[58] Here, the specific

---

[56]*State v. Leavitt,* 111 Wn.2d 66, 75, 758 P.2d 982 (1988).

[57]*Gitchel,* 41 Wn. App. at 828.

[58]*Leavitt,* 111 Wn.2d at 75.

timing of any acts of abuse is unknown, but the girls did make consistent statements of abuse to five people.[59]

The final *Dutton* factor is whether circumstances suggest that the declarant misrepresented the defendant's involvement. Such circumstances are not apparent here.

It is clear that not every factor listed in *Ryan* needs to be satisfied before a court will find a child's hearsay statements reliable under the child victim hearsay statute, RCW 9A.44.120.[60] Moreover, it is also clear that a child's incompetency as a witness is not determinative of the reliability of his or her hearsay statements.[61] The Court of Appeals in this case found no abuse of discretion on the part of the trial court in finding the statements reliable. We uphold this finding because the reliability factors described in *Ryan* are substantially met.

ISSUE FIVE.

CONCLUSION. Though the State's rebuttal evidence did overlap the evidence in the State's case in chief to a degree, the trial court did not abuse its discretion by permitting the State to call the rebuttal witnesses that it did.

 ██ *State v. White,* 74 Wn.2d 386, 394–95, 444 P.2d 661 (1968) contains the classic statement of the scope and purpose of rebuttal evidence:

> Rebuttal evidence is admitted to enable the plaintiff to answer new matter presented by the defense. Genuine rebuttal evidence is not simply a reiteration of evidence in chief but consists of evidence offered in reply to new matters. The plaintiff, therefore, is not allowed to withhold substantial evidence supporting any of the issues which it has the burden of proving in its case in chief merely in order to present this evidence cumulatively at the end of defendant's case. Ascertaining

---

[59]We are not unaware that R.T. at one point evidently also told the police that "Jerry"—her father—put marbles in her bottom.

[60]*See Leavitt,* 111 Wn.2d at 75; *Frey,* 43 Wn. App. at 611; *John Doe,* 105 Wn.2d at 896; *Gitchel,* 41 Wn. App. at 827–28.

[61]*State v. John Doe,* 105 Wn.2d 889, 896, 719 P.2d 554 (1986); *State v. Ryan,* 103 Wn.2d 165, 174, 691 P.2d 197 (1984); *Frey,* 43 Wn. App. at 611 n.9; *State v. Griffith,* 45 Wn. App. 728, 733, 727 P.2d 247 (1986).

whether the rebuttal evidence is in reply to new matters established by the defense, however, is a difficult matter at times. Frequently true rebuttal evidence will, in some degree, overlap or coalesce with the evidence in chief. Therefore, the question of admissibility of evidence on rebuttal rests largely on the trial court's discretion, and error in denying or allowing it can be predicated only upon a manifest abuse of that discretion.

(Citations omitted.) *See also* 5A K. Tegland, Wash. Prac., *Evidence* § 249, at 278–79 (3d ed. 1989).

Defendants assign error to the admission of hearsay testimony offered by two rebuttal witnesses. After the defendants William and Kathleen Swan testified that they had never put anything but a suppository into the vaginal or anal regions of B.A. or R.T., B.A.'s foster mother testified that B.A. told her that her parents put marbles and other things in her bottom. After a detective testified that R.T. said that Jerry put marbles in her bottom, her father (named Gerald) testified that R.T. complained to him later that "Bill and Kathy are bad" and that they put marbles in her bottom.

The defense argues that these hearsay statements were cumulative evidence that was improperly withheld from the State's case in chief so that it could be offered when it would have the most dramatic and prejudicial effect. It is true that this rebuttal evidence did repeat some of the hearsay statements admitted in the State's case in chief. However, as the court in *White* declared, rebuttal evidence will frequently overlap with the evidence in chief.[62]

■ Moreover, we recently held that once a defendant has "opened the door" by testifying to his or her own past good behavior and denying prior acts of misconduct, the State may legitimately impeach such assertions.[63] The trial

---

[62]*State v. White*, 74 Wn.2d 386, 395, 444 P.2d 661 (1968); *see also State v. Hightower*, 36 Wn. App. 536, 548, 676 P.2d 1016, *review denied*, 101 Wn.2d 1013 (1984) (some degree of overlapping with previous state expert testimony occurred, "but even at that the trial court's ruling as to what was proper rebuttal was a discretionary ruling, and we conclude there was no manifest abuse thereof").

[63]*State v. Ciskie*, 110 Wn.2d 263, 281, 751 P.2d 1165 (1988); *Kremer v. Audette*, 35 Wn. App. 643, 648, 668 P.2d 1315 (1983).

court in this case ruled that the proposed rebuttal testimony impeached assertions made by defense witnesses and was admissible. The foster mother's testimony followed William Swan's assertion that he had not had sexual contact with B.A., and R.T.'s father responded to the detective's recollection of R.T.'s statement potentially implicating "Jerry". Neither piece of rebuttal evidence was substantial, and both replied to new matters raised by the defense. Accordingly, we do not consider the two witnesses' testimony inappropriate under the rules set forth in *White*.

Defendants make the related argument that the foster mother's rebuttal testimony was improper because the defense did not have advance notice of the hearsay statements she would be offering into evidence. The child victim hearsay statute, RCW 9A.44.120, provides that

> A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement.

This requirement, in the context of rebuttal testimony, must be considered with another holding in *White* that it is not error to admit rebuttal testimony even though the witness' name has not been endorsed upon the information or furnished to the defendant in advance of trial because genuine rebuttal witnesses need not be so listed.[64]

 The State responds that it did disclose its intention to have B.A.'s foster mother testify at the close of the defendants' case. Moreover, she did not testify until a full day after the defense was told about the hearsay to which she would testify. The State argues that the content of the hearsay was no surprise and that the defense had the "fair opportunity to prepare to meet the statement" required by the statute, RCW 9A.44.120. Since the defense at no time requested a continuance or a chance to reopen its case, it cannot now argue that ample preparation time was lacking.

---

[64]*White*, 74 Wn.2d at 395.

In any event, the trial court considered this objection and rejected it, and did not commit a manifest abuse of discretion in so doing.

ISSUE SIX.

CONCLUSION. The trial court did not abuse its discretion in declining to allow a psychologist to testify as an expert witness.

 ██ ER 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This court has stated that the admissibility of expert testimony under ER 702 depends upon whether "(1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact."[65] The decision whether or not to admit expert opinion evidence is within the discretion of the trial court and will not be disturbed absent a showing of an abuse of that discretion.[66]

At the trial of this case, the defense sought to qualify Dr. Ralph Underwager, a licensed psychologist, as an expert witness. He would have testified about how a child's memory capacity is affected by age and about the factors that create suggestion when an adult interviews a child, such as the adult's expectations.

The trial court ruled that the psychologist's proposed testimony was not proper because there was no indication that the results of the doctor's work had been accepted in the scientific community and because the testimony went

---

[65]*State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984); *see also State v. Canaday,* 90 Wn.2d 808, 812–14, 585 P.2d 1185 (1978).

[66]*State v. Mak,* 105 Wn.2d 692, 715, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986); *Keegan v. Grant Cy. PUD 2,* 34 Wn. App. 274, 282, 661 P.2d 146 (1983).

directly to the credibility of the victims and invaded the province of the jury. The trial court also ruled that the idea that interviews of children may be suggestive was within the general experience of the average person. The trial court reiterated its position in denying the motion for a new trial:

> [T]he Court remains convinced [the psychologist] did not have the qualifications to testify as a doctor, and that the offered testimony, in any event, was within the common experience of the jury. . . . the dangers of interviews of children . . . was [*sic*] within common experience of all of us. That was fully explored on cross–examination with other witnesses. [The psychologist] [w]as a researcher who did not have bona fide qualifications in the view of the Court. He was not involved in an independent research undertaking, but rather was approached to undertake research by an interested party with an interest [in] the outcome of the research. It is the Court's memory [the psychologist's] research was undertaken at the behest of the insurance industry relative to civil claims for child sexual abuse. The fact that three–and–a–half–year–old children are suggestible, I think, is within the common experience of any juror.

The Court of Appeals devoted attention to this issue because it felt that the offer of such evidence was likely to occur at the retrial it ordered. It concluded that the trial court did not abuse its discretion in excluding the psychologist's testimony. "We have reviewed the record and find that it does not sufficiently establish the reliability of the expert's methodology, factors, or the principles which he proposed to use in his testimony."

We agree. It was not shown at trial that the psychologist's position on child interviewing was accepted by the scientific community. Moreover, the argument that child interviews could be suggestive was amply aired during the cross examination of the State's witnesses and, as the trial court declared, was well within the understanding of the jury. The psychologist's proposed testimony did not satisfy the test for admissibility set forth in ER 702 and was properly refused.

Issue Seven.

Conclusion. The trial court's statement here at issue revealed no personal attitudes toward the case or the evidence and did not constitute a prohibited comment on the evidence.

■ Article 4, section 16 of the Washington State Constitution prohibits a trial court from commenting on the evidence. The purpose of this provision is to prevent a jury from being influenced by knowledge conveyed to it by the trial judge as to the trial judge's opinion of the evidence submitted.[67] An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed the testimony in question.[68]

The defendants claim that the trial court impermissibly commented on the evidence in accepting Dr. Carol Jenny as an expert witness. The trial court's words are as follows, with the alleged comment emphasized:

> Well, I think the evidence establishes her qualifications in the general subject of sexual abuse of children. *The court will accept her as an expert on that subject.*

The Court of Appeals examined this issue and concluded that the trial court's statement was not a comment on the evidence. It held that "[t]he court's ruling merely indicates that the threshold query provided in ER 702 was satisfied. The court offered no opinion as to the credibility, sufficiency, or weight of Dr. Jenny's testimony."

We agree. A court must be allowed to rule as to the qualifications of expert witnesses and inform counsel of its decision. The trial court did just that in its ruling regarding Dr. Jenny and did not offer a personal opinion about the

---

[67]*State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970).

[68]*Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988); *State v. Ciskie*, 110 Wn.2d 263, 283, 751 P.2d 1165 (1988).

doctor's testimony. There was no comment on the evidence in accepting the doctor as an expert witness.

ISSUE EIGHT.

CONCLUSION. There was no error in the trial court's evidentiary ruling in question since the court did not strike the defendant's explanation from the record.

The ruling here challenged occurred when the defendant William Swan was testifying on direct:

Q. Was there a situation where your daughter made reference to the bathroom and described or used a word to describe the bathroom?

A. Yes.

Q. Okay. I'll ask you to recall for the jury, recount to the jury what that situation was.

A. Okay. I was in the process of using the bathroom in question, which happens to be across the hall from her room, with the door locked, as is my habit. She came up, turned the door knob and, of course, the door didn't open, and then she tried it again, and so I told her, "Just a minute, [B.A.]," and then she started banging on the door a bit. I said, "Just a minute, [B.A.], I'll be out in just a minute," and then she started crying and carrying on and saying, "Daddy, Daddy is in my potty."

Q. Was that her phrase for the bathroom, "My potty?"

A. Yes.

[Prosecutor]: I would object as—I am sorry, I do object to that question and answer on the basis of lack of foundation at this point, ask it be stricken.

THE COURT: Sustained.

Defense counsel did not pursue this line of questioning but went on to ask the defendant about medication he gave to his daughter. The defendants contend on appeal, however, that the objection as to lack of foundation was insufficient and improper.

 The admission and exclusion of relevant evidence is within the sound discretion of the trial court. This is yet another place in the trial of a case where the trial court's decision will not be reversed absent a manifest abuse of discretion.[69]

---

[69]*Maehren v. Seattle*, 92 Wn.2d 480, 488, 599 P.2d 1255 (1979), *cert. denied*, 452 U.S. 938 (1981); *Chhuth v. George*, 43 Wn. App. 640, 648, 719 P.2d 562, *review denied*, 106 Wn.2d 1007 (1986).

 While the lack of foundation objection may be considered a general objection, general objections are not prohibited.[70] According to one Washington practice text:

> The court may sustain or overrule a general objection in light of its own understanding of the merits of the objection or the evidence offered. . . .
>
> If the trial court *sustains* a general objection, the ruling will be affirmed if there was any valid basis for excluding the evidence.

(Footnotes omitted.) 5 K. Tegland, Wash. Prac., *Evidence* § 10, at 32, 35 (3d ed. 1989).

 A valid basis for sustaining the objection to the "potty" question was that it was a leading question improperly used on direct examination.[71] Thus, we could affirm the court's ruling on that ground. More to the point, however, is the wording used to sustain the objection. The trial court merely ruled "sustained". It did *not* strike the testimony, as the deputy prosecuting attorney requested, nor did it instruct the jury to disregard it. The defendant's testimony thus remained in the record for the jury's consideration and defendants' position on this issue is without merit.

ISSUE NINE.

CONCLUSION. No reversible error was committed in the deputy prosecuting attorney's closing argument since the jury was instructed to disregard the only statement objected to and since none of the other statements now claimed to have been erroneous was so flagrant, ill intentioned, or prejudicial as to require reversal.

Defendants argue that each of four statements made by the deputy prosecuting attorney during closing argument constitutes reversible error. Two of the statements (emphasized immediately below) described some of the testimony

---

[70]5 K. Tegland, Wash. Prac., *Evidence* § 10, at 32 (3d ed. 1989).

[71]5A K. Tegland, Wash. Prac., *Evidence* § 250, at 281 (3d ed. 1989); ER 611(c).

given by Dr. Parris, the Swans' family physician, and were part of the State's rebuttal argument:

> (By the deputy prosecuting attorney): *Dr. Parris said, "I'm not an expert. I don't do this. If you want to prove your innocence, take the child to Harborview immediately." What did the Swans do? They asked C.P.S. to take the child to Dr. Parris.*
>
> (Defense counsel): Objection, Your Honor. The last two statements are not in evidence and are not reflecting the truth. I would request they be stricken.
>
> (Deputy prosecuting attorney): I'm speaking with reference to [the CPS caseworker].
>
> (Defense counsel): [The CPS caseworker] is not a party to the conversation.
>
> THE COURT: Sustained. I don't recall that. The jury will disregard that remark.
>
> (Deputy prosecuting attorney): *There's no evidence of any request that this child be rushed to Harborview so they could prove their innocence. Instead, the child was taken to someone who said, "I don't know about this. I'm not an expert."*

(Italics ours.)

The third allegedly prejudicial argument (emphasized below), also made during the State's rebuttal argument, described the medical evidence given by Thomas Ritter, the nurse practitioner who examined B.A.:

> The other thing is all this talk about hymens. I thought it was quite clear, Dr. Jenny, Dr. Ciliberti, all the people say the presence or the nonpresence of a hymen doesn't mean a thing. *Mr. Ritter said in his notes he did not note a hymen. And, thinking back, he thinks it means there was not there—one there. That was his recollection.* Dr. Parris said he did not note one in his report, but he sort of assumes he saw one. So whether it was there or not or present is sort of up in the air.

(Italics ours.)

The final challenged remark (emphasized below) was part of the deputy prosecuting attorney's descriptions of B.A. and R.T.:

> Between the two of them—We know that [B.A.] had no sex education from her parents. That was pretty clear. And we also know that *neither child had trouble with lying.* That wasn't something that came out, that there were problems with these children lying or that these were children you had to watch

carefully. *These were little girls who* could talk, you could trust, they *told the truth.*

(Italics ours.)

At trial, the defense objected to only the first of the foregoing statements, the one regarding Dr. Parris.

 We have consistently held that unless prosecutorial conduct is flagrant and ill–intentioned, and the prejudice resulting therefrom so marked and enduring that corrective instructions or admonitions could not neutralize its effect, any objection to such conduct is waived by failure to make an adequate timely objection and request a curative instruction.[72] Thus, in order for an appellate court to consider an alleged error in the State's closing argument, the defendant must ordinarily move for a mistrial or request a curative instruction.[73] The absence of a motion for mistrial at the time of the argument strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.[74] Moreover, "[c]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal."[75]

 Defense counsel did object to the statement regarding Dr. Parris. The objection was sustained, and the jury was instructed to disregard the prosecutor's remark. While this statement was not supported by the evidence, it was not prejudicial error that denied the defendants a fair

---

[72]*State v. Charlton*, 90 Wn.2d 657, 661, 585 P.2d 142 (1978); *State v. Brown*, 29 Wn. App. 770, 774, 630 P.2d 1378, *review denied*, 96 Wn.2d 1013 (1981).

[73]13 R. Ferguson, Wash. Prac., *Criminal Practice and Procedure* § 4006, at 404 (1984).

[74]*State v. Miller*, 66 Wn.2d 535, 537, 403 P.2d 884 (1965); *State v. Walton*, 5 Wn. App. 150, 152, 486 P.2d 1118 (1971).

[75]*Jones v. Hogan*, 56 Wn.2d 23, 27, 351 P.2d 153 (1960); *State v. Atkinson*, 19 Wn. App. 107, 111, 575 P.2d 240, *review denied*, 90 Wn.2d 1013 (1978).

trial since the jury is presumed to follow the court's instructions to disregard it.[76]

Defense counsel voiced no objection to the prosecutor's second reference to Dr. Parris' testimony, *i.e.,* "There's no evidence of any request that this child be rushed to Harborview so they could prove their innocence. Instead, the child was taken to someone who said, 'I don't know about this. I'm not an expert.'"

It is true that B.A. never was taken to the Sexual Assault Center at Harborview Medical Center. At trial, Dr. Parris testified that before he examined B.A., he recommended to the defendants that she be examined at a sexual assault center to see if the alleged abuse had occurred. CPS originally took B.A. to nurse practitioner Thomas Ritter for a physical examination. No one took the child to Harborview.

The context of the deputy prosecuting attorney's arguments here objected to is as follows. In the defendants' closing argument, it was defense counsel who argued that the failure to take B.A. to Harborview was the fault of CPS, and that this failure meant that the prosecution lacked the medical evidence needed to prove its case. The deputy prosecuting attorney's subsequent effort, in rebuttal argument, to blame the defendants for that omission was both a response to the defense argument and an inference that could be drawn from the evidence presented at trial. While Dr. Parris did not testify in the exact words the deputy prosecuting attorney quoted, his testimony could reasonably lead to the inference that the defendants never took B.A. to someone who was an expert on sexual abuse.

Counsel must be accorded a reasonable latitude in argument to draw and express inferences and deductions from

---

[76]*State v. Kroll,* 87 Wn.2d 829, 835, 558 P.2d 173 (1976); *State v. Fondren,* 41 Wn. App. 17, 25, 701 P.2d 810, *review denied,* 104 Wn.2d 1015 (1985).

the evidence.[77] Moreover, remarks of the deputy prosecuting attorney that would otherwise be improper are not grounds for reversal where they are in reply to defense counsel's statements unless the remarks are so prejudicial that an instruction would not cure them.[78] While not absolutely accurate, the statement attributed to Dr. Parris in argument was made in response to defense counsel's argument and under the circumstances was not so flagrant and ill–intentioned as to result in prejudice that could not have been cured by a timely objection and a curative instruction.

The statement regarding Thomas Ritter's medical findings also is technically incorrect, since Ritter testified that he did not note whether B.A. had a hymen. However, as the deputy prosecuting attorney's argument shows, the evidence about the presence or absence of a hymen was fairly murky. Ritter found an enlarged vaginal opening but did not note whether the hymen was missing. Dr. Parris did not note the presence or absence of the hymen, but apparently saw the hymenal ring. Dr. Jenny noted the lack of a specific finding regarding the hymen but concluded that Ritter's ability to see inside the vagina meant that he could see through the hymenal opening.

In closing argument, the defense attempted to discredit Ritter's findings, stating that "he obviously did not do a close examination." The defense also referred to Dr. Parris' observation of a hymenal ring. Then on rebuttal, the State stated somewhat less than artfully that Ritter thought his failure to note a hymen meant that one was absent, and that Dr. Parris assumed he saw one. Neither statement is

---

[77]*State v. Johnson*, 40 Wn. App. 371, 381, 699 P.2d 221 (1985); *State v. Hunter*, 35 Wn. App. 708, 715, 669 P.2d 489, *review denied*, 100 Wn.2d 1030 (1983).

[78]*State v. Davenport*, 100 Wn.2d 757, 761, 675 P.2d 1213 (1984) (citing *State v. La Porte*, 58 Wn.2d 816, 822, 365 P.2d 24 (1961)).

completely accurate. Closer to the mark is the State's last reference to the subject: "So whether it was there or not or present is sort of up in the air."

Here again, we do not perceive the error made in argument about the Ritter statement to be prejudicial. The deputy prosecuting attorney's references to the medical evidence were equivocal, as was the medical testimony itself. An objection and a request for a curative instruction could have remedied any misstatement or potential for prejudice. The failure to object to this reference waived the objection.

■ The final remark the defendants object to is the State's reference to the girls' truthfulness. It is, of course, improper for a prosecutor to express a personal opinion about the credibility of a witness during closing argument.[79] However, prejudicial error does not occur until it is clear that the prosecutor is not arguing an inference from the evidence, but is expressing a personal opinion.[80] The credibility of two State witnesses was "strenuously attacked" by defense counsel in *State v. Papadopoulos,* 34 Wn. App. 397, 399, 662 P.2d 59, *review denied,* 100 Wn.2d 1003 (1983). In closing argument, the prosecutor stated that

"[the witnesses] have testified honestly before you", and, . . . that "[T]he gist of what they have said has been the truth."

*Papadopoulos,* 34 Wn. App. at 399.

The Court of Appeals did not see those statements as an expression of personal belief on the prosecutor's part, holding that the argument viewed in context revealed that the prosecutor merely called the jury's attention to the facts and circumstances in evidence tending to support the witnesses' credibility.[81]

---

[79]*State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984); *State v. Robinson,* 44 Wn. App. 611, 624, 722 P.2d 1379, *review denied,* 107 Wn.2d 1009 (1986).

[80]*Robinson,* 44 Wn. App. at 624; *State v. Papadopoulos,* 34 Wn. App. 397, 400, 662 P.2d 59, *review denied,* 100 Wn.2d 1003 (1983).

[81]*Papadopoulos,* 34 Wn. App. at 400.

In this case, evidence was introduced showing that both B.A. and R.T. were well–behaved, normal children who did not have a problem with lying. There was no objection to this testimony. Nor was there any objection when the deputy prosecuting attorney recalled this testimony in closing argument and then went on to describe the facts and circumstances that supported the girls' credibility. Thus, it is clear to us that the deputy prosecuting attorney was simply drawing a reasonable inference from the evidence—indeed, simply repeating the evidence—and was properly recounting the testimony concerning the girls' truthfulness. Even were we to view the arguments as error, however, it was not of such an egregious sort that a curative instruction could not have removed any resulting prejudice. The deputy prosecuting attorney's arguments here complained of were apparently not viewed as prejudicial at trial, nor do they so appear on appeal. The State did not commit reversible error during closing argument.

ISSUE TEN.

CONCLUSION. The abuse of discretion standard is the appropriate standard of review under RCW 9A.44.120.

 The determination of whether statements are admissible under the statutory child abuse hearsay exception is within the sound discretion of the trial court.[82] This is the standard of review generally applied to rulings on the admissibility of evidence.[83]

Defendants contend that this standard of review is erroneous because any ruling on the admissibility of child hearsay involves fundamental constitutional issues. Where constitutional rights are involved, an appellate court will

---

[82]*State v. Justiniano,* 48 Wn. App. 572, 579, 740 P.2d 872 (1987); *State v. Frey,* 43 Wn. App. 605, 611, 718 P.2d 846 (1986).

[83]*State v. Jones,* 112 Wn.2d 488, 496 n.7, 772 P.2d 496 (1989); *Caruso v. Local Union 690, Int'l Bhd. of Teamsters,* 107 Wn.2d 524, 535, 730 P.2d 1299, *cert. denied,* 484 U.S. 815 (1987).

independently evaluate the evidence to see if such rights have been violated.[84]

It is clear, however, that even when such an independent review is undertaken, the trial court's findings are entitled to great weight.[85] This is because the trial court is "in a prime position to observe and evaluate the demeanor of witnesses."[86] As the Court of Appeals has explained, the appellate court

> will independently examine the record to determine if fundamental constitutional rights have been denied. In considering credibility, however, deference will be made to the trial court, which had the opportunity to evaluate the witnesses' demeanor below. We will review the trial court's inferences and conclusions, but not its findings as to credibility or the weight to be given evidence.

(Citations omitted.) *In re Bugai,* 35 Wn. App. 761, 765, 669 P.2d 903 (1983).

The admissibility of child hearsay statements does touch upon constitutional rights such as the right of confrontation guaranteed by the Sixth Amendment. However, the admissibility of child hearsay depends upon a series of decisions made only after evaluating the competency and credibility of witnesses. The trial court must conduct a hearing during which it determines (a) that the time, content, and circumstances of the statement provide sufficient indicia of reliability and (b) that the child either may testify or is incompetent as a witness. If the child is incompetent, the court must determine whether there is corroborative evidence of the act before admitting the hearsay statements.[87]

---

[84]*See State v. Daugherty,* 94 Wn.2d 263, 269, 616 P.2d 649 (1980), *cert. denied,* 450 U.S. 958 (1981); *State v. Agee,* 89 Wn.2d 416, 419, 573 P.2d 355 (1977).

[85]*Daugherty,* 94 Wn.2d at 269; *Agee,* 89 Wn.2d at 419.

[86]*State v. Miller,* 22 Wn. App. 960, 963, 593 P.2d 177, *review denied,* 92 Wn.2d 1031 (1979).

[87]RCW 9A.44.120.

Appellate courts will carefully review the evidence and testimony presented in evaluating the exclusion and admission of child hearsay statements even under the abuse of discretion standard.[88] Appellate courts also recognize, however, that the trial court is in the best position to make the decisions as to competency and credibility. The abuse of discretion standard, as applied in child hearsay cases, does not ignore the constitutional issues at stake, but acknowledges the obvious, that the trial court is the only court that sees the children and listens to them and to the other witnesses in such a case.

ISSUE ELEVEN.

CONCLUSION. We adhere to our previous decisions upholding the constitutionality of the child victim hearsay statute, RCW 9A.44.120.

This court decided this issue in *State v. Ryan,* 103 Wn.2d 165, 691 P.2d 197 (1984). Defendants recognize this, but contend that the court in *Ryan* improperly relied on factually distinguishable cases in holding that RCW 9A.44.120 is constitutional. The cases relied on in *Ryan* that the defendant questions are *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) and *Dutton v. Evans,* 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970). Both cases involved the admission of hearsay testimony, which is clearly relevant to any discussion of RCW 9A.44.120, and both are recognized as key cases on the admissibility of out–of–court statements.[89]

Defendants urge this court to rely instead on *Coy v. Iowa,* 487 U.S. 1012, 101 L. Ed. 2d 857, 108 S. Ct. 2798 (1988) in assessing the admissibility of child hearsay. At issue in *Coy* was the constitutionality of a screen placed between the defendant and two child victims while they testified in court. *Coy* does not contain the factual parallels

---

[88]*See, e.g., State v. Jones,* 112 Wn.2d 488, 722 P.2d 496 (1989); *State v. Justiniano,* 48 Wn. App. 572, 740 P.2d 872 (1987).

[89]*See Coy v. Iowa,* 487 U.S. 1012, 101 L. Ed. 2d 857, 108 S. Ct. 2798, 2800 (1988).

to this case that are allegedly absent from *Roberts* and *Dutton.* Nor does the legal analysis in *Coy* seem directly relevant here. The United States Supreme Court in *Coy* held that the screen violated the confrontation clause and was unconstitutional.[90] The confrontation clause guarantees the defendant a face–to–face meeting with witnesses appearing before the trier of fact.[91] The Court in *Coy* expressly left open the question of whether any exceptions to the right to face–to–face confrontation exist.[92] The Court cited *Roberts* after stating that "[w]hatever they may be, they would surely be allowed only when necessary to further an important public policy."[93]

■ Thus, the United States Supreme Court has not held that the admission of child hearsay statements violates any provision of the federal constitution. We adhere to our holding in *Ryan* that RCW 9A.44.120 is constitutional.

ISSUE TWELVE.

CONCLUSION. The State did not knowingly withhold exculpatory evidence from the defense in violation of due process.

This contention was raised earlier in connection with Issue Two. The defendants argue that the prosecution suppressed evidence regarding Lisa Conradi's sexual abuse and thus violated their right to due process. Defendants maintain that Conradi's predisposition to discover sexual abuse should have been a central issue at trial.

■ The prosecutor has a constitutional duty to disclose exculpatory matter to the defense.[94] "This duty is

---

[90]*Coy,* at 1022.

[91]*Coy,* at 1016.

[92]*Coy,* at 1021.

[93]*Coy,* at 1021.

[94]*State v. Bebb,* 108 Wn.2d 515, 522, 740 P.2d 829 (1987); *see also State v. Campbell,* 103 Wn.2d 1, 17, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985).

breached where the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt as to defendant's guilt that did not otherwise exist."[95]

The evidence allegedly showing that the State possessed information about Conradi's abuse is the following statement made by the State when Conradi was being deposed:

> When asked if she had ever been abused or about the individual who had abused her two sons, the prosecutor advised Conradi not to answer unless relevancy could be shown.

Supplemental Brief of Petitioner, at 10.

Apart from the fact that no attempt to require the witness to answer this question or establish relevancy was ever made, it does not follow that the State suppressed information about Conradi's abuse. Even if the State had suppressed such information, however, we fail to see that it was exculpatory evidence that could have created a reasonable doubt as to the defendants' guilt that did not otherwise exist. Witness Conradi's credibility was strenuously challenged at trial, and her alleged predisposition to discover sexual abuse was also argued. Moreover, Conradi was not the only witness to reveal the girls' hearsay statements. Other witnesses repeated equally damaging hearsay. Nothing suggests that further evidence of witness Conradi's alleged predisposition to discover abuse would have exculpated the defendants. We perceive no error in this regard and no due process violation.

The Court of Appeals is reversed and the convictions of the two defendants in the trial court are affirmed.

CALLOW, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, DURHAM, and SMITH, JJ., and PEARSON, J. PRO TEM., concur.

Reconsideration denied June 22, 1990.

---

[95]*Bebb,* 108 Wn.2d at 522; *see also Campbell,* 103 Wn.2d at 17.