[Nos. 27000-9-III; 27026-2-III.   Division Three.   October 15, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. PETER S. NELSON, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. ALFREDO LEE RENTERIA, *Appellant*.

*William D. Edelblute* and *Scott R. Hill*, for appellants.

*Steven J. Tucker, Prosecuting Attorney*, and *Mark E. Lindsey, Deputy*, for respondent.

¶1 SWEENEY, J. — We have consolidated these separate appeals for this opinion since both the essential assignments of error and the facts are the same. RAP 3.3(b). Both defendants appeal from convictions of animal fighting and operating an unlicensed private kennel. Both contend that the trial judge abused her discretion by allowing an expert from the Humane Society to express an opinion on the ultimate issue of fact, namely that the evidence showed that the defendants intended to engage in dogfighting exhibitions. We conclude that the expert's opinion was well supported by the evidence and was an appropriate opinion for an expert and that the trial judge, therefore, did not abuse her discretion by allowing the expert to express the opinion even if it encompassed an ultimate issue of fact. We also

find no merit in the defendants' other assignments of error and, therefore, affirm the convictions.

## FACTS

¶2 In June 2006, an animal protection officer was dispatched to a house on East Utah Avenue in Spokane, Washington, following reports of a dogfight. By the time the officer arrived, the owner of the two pit bull dogs, Peter Nelson, had already arrived and stopped the fight. Both dogs suffered multiple puncture wounds, and one dog's ear was ripped in half. Police did not file charges.

¶3 In April 2007, Spokane County animal protection officer Nicole Montano responded to a complaint that a man was beating a dog at the same East Utah Avenue address. Ms. Montano went to the edge of the property and saw eight pit bulls in the backyard. Two of the dogs did not have access to water, and several of the dogs were either on heavy chains or kenneled together or separately.

¶4 Ms. Montano then searched Spokane County records and found that there was no licensed kennel at the East Utah Avenue address. But two dogs at the address were licensed, one each to Alfredo Renteria and Peter Nelson. Mr. Renteria had licensed numerous pit bulls at the east Utah Street address since 2001.

¶5 Police applied for and were granted a warrant to search the property. Members of the Spokane County Animal Control, the Washington State Gambling Commission, and the Spokane County Sheriff's Office SWAT (special weapons and tactics) team executed the search warrant. Mr. Nelson was present during the search. They found:

From a mudroom/utility room in the house:

- Veterinary medical supplies including Betadine surgical scrub, antiseptic sudsing skin cleanser, blood-stop powder, mineral and vitamin supplements, 500 mg amoxicillin capsules, dexamethasone sodium phosphate injection for horses, SWAT Original fly repellant ointment for wounds and sores, Pet-Otic ear cleaner for dogs

and cats, oil skin treatment, and aloe vera and jojoba skin salves for dogs.

- A veterinary kit containing supplies such as syringes, surgical blades, ointments, scissors, and various veterinary drugs.
- A basket muzzle, three harnesses, three collars, a pull toy, and training tools.
- A metal dog kennel or cage. Officers found seven or eight kennels during the search, some inside and some outside.

From the southeast bedroom of the house:

- A receipt from a purchase by Mr. Nelson at a store called "Dogtown Company."
- A T-shirt imprinted with a photo of Mr. Nelson and a dog and the name "Capone."
- A knife-shaped chew toy.
- A handwritten IOU note from someone named Terry Naffziger to Mr. Nelson for $1,200.
- Periodicals about pit bulls.
- Photo album with photos of dogs.
- Mail addressed to Mr. Nelson at the East Utah Avenue address.
- A safe with $414 in United States currency and notes.

From the living room of the house:

- A mouse pad with a picture of a chained pit bull.

From a storage shed at the back of the garage:

- Notebooks and papers that the State characterized as "dog training logs."
- In dresser drawers, mail addressed to Alfredo Renteria at the East Utah Avenue address.
- A treadmill.
- A notebook and a receipt book.

From the backyard:

- A dog collar hooked to a chain and cable attached to a pole pounded vertically into the ground.

- Nylon and metal chain dog collars.
- Two dog tags indicating city of Spokane pet licenses for "Shorty" and "Rita."

¶6 Some of the items found were for horses. But there were no horses on the property. The search team also seized eight dogs from the property. A veterinarian was present during the search and examined the dogs.

¶7 The State charged Mr. Nelson with one count of animal fighting, one count of transporting or confining an animal in an unsafe manner, one count of operating an unlicensed private kennel, and one count of possession of a controlled substance (marijuana). The State charged Mr. Renteria with one count of animal fighting, one count of transporting or confining an animal in an unsafe manner, one count of operating an unlicensed private kennel, one count of possession of a controlled substance (marijuana), and one count of first degree animal cruelty.

¶8 The cases were tried together. The veterinarian testified about the physical condition of the dogs seized from the property. A dog named "Callie" was excessively thin and had numerous old scars on both forelimbs, on her right rear leg, and on top of her head. A dog named "Zeeda" had two recently torn ears, old wounds on both forelimbs and the right hip, and calluses on both forelimbs. A dog named "Chewy" had a torn left ear and an impression around its torso that indicated it likely had a belt attached to him one or two days before. A dog named "Rita" had sutures on its chest and calluses on its tail and hocks. A dog named "Fatty" had calluses on its wrist areas and left rear heel, and collar rub to the skin on the throat. A dog named "Gorda" displayed a broken upper right canine tooth, collar abrasions on its throat, and calluses on its front carpuses (wrists) and rear heels.

¶9 The veterinarian testified that fights that arose spontaneously between or among the dogs could have caused all of the injuries except Callie's leg wounds. Callie's leg wounds were so numerous that they more likely resulted from human involvement. He also agreed that all of the veterinary supplies that were found in the mudroom could

be used for horses. And he said that "lactated ringers" were used to rehydrate an animal suffering from dehydration or to flush out an animal's system in a veterinary surgical setting.

¶10 An officer photographed tattoos on Mr. Nelson's arms, legs, and back, at least some of which depict dogs. The tattoo on Mr. Nelson's back depicts two pit bulls fighting each other.

¶11 The State called Eric Sakach as an expert. He is the West Coast regional director for the Humane Society of the United States. Mr. Sakach explained that he began his 32-year career with the Humane Society as an investigator who eventually specialized in investigating and infiltrating animal fighting rings. Over the years he had looked into hundreds of potential dogfighting cases and had attended approximately one dozen dogfights for purposes of investigation or surveillance. Mr. Sakach was conversant with and testified about the history of dogfighting and the present business of dogfighting exhibitions. He had previously testified as an expert on dogfighting in 50 to 75 trials. He explained the significance of the information discovered and the items found at the East Utah Avenue property. For example, he said that the notations in one of the notebooks found in the shed off the garage appeared to be a "keep," a diet and exercise plan for specific dogs to "build cardiovascular fitness in the animal while reducing its weight to its optimum fighting weight." Report of Proceedings (RP) at 461. In a different section of the same notebook, Mr. Sakach identified a "Colby's Test," a plan for assessing a dog's strength and endurance for fighting and habituating a dog to fight. He knew and explained the significance of Mr. Nelson's tattoo depicting two dogs fighting. He knew that many people involved with dogfighting exhibitions had tattoos of animals fighting. He also noted that law enforcement officers in jails often catalog inmates' tattoos because finding "somebody with a tattoo depicting fighting cocks or fighting dogs . . . is a lead for detectives." RP at 486. Mr. Sakach then gave his expert opinion on the significance of all of this:

> Based on the totality of the evidence, in my view, in my opinion, this was a dogfighting operation and the dogs that were on that property or a portion of the dogs that were on that property were being kept were possessed with the intent that they be engaged in a dogfighting exhibition. That was their purpose.

RP at 487.

¶12 Mr. Sakach based this on the manner in which the dogs were kept, the injuries to the dogs, and the presence of various items, which, although legal in their own right, were all consistent with a dogfighting operation when viewed together. He testified that medical supplies such as dexamethasone, lactated ringers, and suture kits were "designed to patch a dog up . . . in response to a fight." RP at 490-91. And the "underground publications" about pit bull fighting were "things [that] any normal person would be miles away from." RP at 491.

¶13 Mr. Renteria testified that he worked with his grandparents at Playfair Racetrack when he was growing up. He saw his grandfather administer drugs such as dexamethasone and other treatments to the horses at the racetrack. The racetrack closed in 2000. And his grandparents stored some of the racetrack supplies in Mr. Renteria's East Utah Avenue garage. Mr. Renteria leased the house to Mr. Nelson from June 2006 until June 2007. And he said that the receipt book that the police found in the shed was where he recorded Mr. Nelson's rental payments. Mr. Renteria came to the house to collect rent each month, and he also picked up his mail then.

¶14 Mr. Renteria said he started the training logs around 2001 when he began to train his dogs for weight pulling competitions. He also created training logs for his friend's dogs. And he labeled the training logs "keeps" on the notebooks because he thought, based on his Internet research, that training logs for dogs were called "keeps" even outside the context of fighting. He said that the Colby's Test notations at the back of the notebook were not in his handwriting and that he did not write them, nor did he know how or when they were added to the notebook. And he

said he got the treadmill when he purchased his first dog. He never used the treadmill and stored it in the garage immediately upon moving to the East Utah Avenue property.

¶15 The defense called Scott Kates to testify. Mr. Kates is the owner of Dogtown Company. He sells dogs and specialty products for dogs, including restraint mechanisms, toys, food, and clothing. He also sponsors weight-pulling competitions. He knew Mr. Nelson as a Dogtown customer. And Mr. Renteria worked for a while at the Dogtown store. Mr. Kates testified at length about the benign purposes for items found at the East Utah Avenue property. He sold many of the items at his Dogtown store.

¶16 The court submitted the matters to the jury with appropriate instructions to determine Mr. Nelson's and Mr. Renteria's guilt or innocence for the crimes of animal fighting, transporting or confining an animal in an unsafe manner, maintaining an unlicensed private kennel, and, for Mr. Renteria only, first degree animal cruelty.

¶17 The jury found Mr. Nelson guilty of animal fighting and of operating an unlicensed private kennel. The jury found Mr. Renteria guilty of animal fighting and operating an unlicensed private kennel.

## DISCUSSION

Expert Opinion—Dogfighting

¶18 Mr. Nelson and Mr. Renteria both argue that Mr. Sakach's opinion testimony was improper because it was an opinion on the defendants' guilt.

¶19 Whether to admit expert opinions, and to what extent, is a matter addressed to the sound discretion of the trial judge. *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990). And we reverse only for abuse of that discretion. *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003). Abuse requires a showing that the trial judge's decision is based on untenable grounds or untenable reasons. *State v. Hudson*, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009). So

the question is not whether we would have made a different decision. The question, instead, is whether the decision of the trial judge is tenable.

¶20 We defer to trial judges on these questions for a number of reasons. Among those reasons is the inability of appellate courts to craft a rule that would apply to every case. *Seventh Elect Church in Israel v. Rogers*, 34 Wn. App. 105, 114, 660 P.2d 280 (1983); Roscoe Pound, *Discretion, Dispensation and Mitigation: The Problem of the Individual Special Case*, 35 N.Y.U. L. REV. 925, 926-27 (1960). "The non-amenability of the problem to rule, because of the diffuseness of circumstances, novelty, vagueness, or similar reasons that argue for allowing experience to develop, appears to be a sound reason for conferring discretion on the magistrate." Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 SYRACUSE L. REV. 635, 663 (1971).

¶21 The rule on expert testimony is simple and straightforward:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 702.

¶22 Courts in this state have generally interpreted this as requiring a showing and findings by the trial judge on three things: "(1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact." *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984). And there is no argument about whether Mr. Sakach and his opinions satisfied these three criteria.

¶23 The challenge here is that Mr. Sakach was allowed to express an opinion on the ultimate issue in the case—that these defendants were engaged in "a dogfighting

operation and the dogs . . . were possessed with the intent that they be engaged in a dogfighting exhibition." RP at 487. But we have long held in this state that expert opinions are not prohibited because they embrace the ultimate issue to be decided by the trier of fact. *Davis v. Baugh Indus. Contractors, Inc.*, 159 Wn.2d 413, 420-21, 150 P.3d 545 (2007); *State v. Kirkman*, 159 Wn.2d 918, 929, 155 P.3d 125 (2007). Indeed, ER 704 expressly allows for the admission of an otherwise admissible opinion or inference on an ultimate issue that the trier of fact must decide. *City of Seattle v. Heatley*, 70 Wn. App. 573, 578-79, 854 P.2d 658 (1993). "To be otherwise admissible, opinion evidence must also satisfy ER 403, ER 701, and ER 702." *State v. Farr-Lenzini*, 93 Wn. App. 453, 460, 970 P.2d 313 (1999); *see also Heatley*, 70 Wn. App. at 579.

¶24 ER 702 allows experts to offer opinion testimony where it is helpful to the trier of fact and is informed by specialized knowledge, experience, or training. And ER 403 provides the general limitation that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice" and other circumstances. An expert may not comment on a defendant's guilt or innocence. *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). But we have expressly declined to take an expansive view "of claims that testimony constitutes an opinion on guilt." *Heatley*, 70 Wn. App. at 579. So we have also given the trial judge broad discretion on the question of what constitutes an ultimate issue of fact. *Id.* "In most cases where testimony on the ultimate issue has been excluded, either the expert had testified in terms of legal standards beyond his or her expertise, or else the subject was not beyond the jury's capability to decide." ROBERT A. ARONSON, THE LAW OF EVIDENCE IN WASHINGTON § 704.04, at 704-10 (4th ed. 2008).

¶25 The expert opinion here—that these defendants were doing something more nefarious than training dogs for weight pulling contests—is not a direct statement of guilt or innocence. Nor is it otherwise inadmissible under

ER 702 or ER 403. It is instead a fair summary and opinion of the significance of the other evidence offered by the State.

¶26 The opinions here were based on the evidence and Mr. Sakach's experience. He did not comment on the defendants' credibility. *See State v. We*, 138 Wn. App. 716, 724-25, 158 P.3d 1238 (2007). The State offered a wide array of physical and testimonial evidence. But each piece taken in isolation would not lead to the conclusion that this was a dogfighting operation. And the trial judge apparently assumed that most jurors would not be familiar with the world of dogfighting. We think that is a fair assumption.

¶27 The defendants argue, nonetheless, that the expert's statements invaded the exclusive province of the jury. But in order to convict someone of a crime, the evidence (including expert opinions) must support the elements of the crime set out by the legislature. That the testimony, expert or lay, is then couched in terms of those statutory elements should come as no surprise. "Washington law favors resolution of issues on the merits. It should not be fatal to a party's claim or defense that an expert used legal jargon, so long as an appropriate foundation for the conclusion can be gleaned from the testimony." *Davis*, 159 Wn.2d at 420.

¶28 Mr. Sakach was an expert; no one challenges that. The defense here was that the substantial circumstantial evidence showed only the intent to engage in legal weight-pulling contests. For us, then, it is appropriate, indeed predictable, that the State would offer an expert opinion that this circumstantial evidence shows that Mr. Nelson and Mr. Renteria had every intention of engaging in illegal dogfighting exhibitions. It was then up to the jury to accept either the defendants' characterization of the evidence or the State's. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Where else would the State go for testimony that this was not the innocuous, legal use of animals rather than an illegal dogfighting enterprise? The expert opinion here was not on the ultimate issue of guilt. The opinion was a classic expert opinion, which the jury was invited to accept or reject. Clerk's Papers (CP) (Nelson) at 165, 172.

¶29 Moreover, the parties and the court adhered to the format suggested in our Supreme Court's decision in *State v. Montgomery*, 163 Wn.2d 577, 594 n.8, 183 P.3d 267 (2008). The State asked Mr. Sakach, "Sir, based on the totality of information that you have reviewed about 8006 East Utah, do you have an opinion about what was occurring there?" RP at 486. Mr. Sakach responded, "Yes. Based on the totality of the evidence, in my view, in my opinion, this was a dogfighting operation and the dogs that were on that property or a portion of the dogs that were on that property were being kept were possessed with the intent that they be engaged in a dogfighting exhibition. That was their purpose." RP at 487.

¶30 Mr. Sakach pulled disparate pieces of evidence, such as a pit bull magazine here and a pull toy there, into a coherent picture for the jury. For example, he identified a notebook with what would be to the average person very ambiguous notations as a "keep," recording the training and diet for several dogs in preparation for fighting. RP at 461-62. He characterized the treadmill as an item that is "consistently found in connection with dogfighting operations." RP at 472. And he indicated that "breaking sticks" are primarily designed to separate fighting dogs. RP at 475-76.

¶31 Finally on this point, the trial court instructed the jury that it is the jury's duty to decide the facts of the case based on the evidence at trial. And in another instruction the trial court explained that the jury is not bound to follow any opinion expressed by an expert witness.

¶32 We conclude that the trial judge did not abuse her discretion by allowing the expert opinion here.

ADMISSIBILITY—OPINION: ILLEGAL KENNEL

¶33 The defendants also argue that Officer Montano's testimony that she "did notice immediately that there was no legal count" and that "[t]here was an illegal kennel" was a direct comment on the defendants' guilt. RP at 549.

¶34 Neither defendant objected to Officer Montano's testimony at trial. So they must show manifest error affecting a constitutional right. *Kirkman*, 159 Wn.2d at 926-27. We narrowly interpret the term "manifest error." The error must have caused "actual prejudice" as demonstrated by " 'practical and identifiable consequences.' " *Id.* at 935 (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

¶35 The court instructed the jury that it had the duty of deciding the facts based on the evidence presented and was not bound by an expert witness's opinion. The court also instructed the jury on the elements necessary to show operation of a private kennel in violation of the ordinance. And, more importantly, that question turned on the simple mathematical calculation of how many dogs were being kept. There is no dispute on that. So even assuming that the testimony was improper, it is difficult for us to find prejudice.

SUFFICIENCY OF THE EVIDENCE

¶36 Mr. Nelson and Mr. Renteria next argue that the evidence is insufficient to find that they intended illegal dogfighting exhibitions, particularly if Mr. Sakach's opinion is excluded.

¶37 We view the evidence in a light most favorable to the State and ask whether any rational fact finder could find the elements of the crime. *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008). The question here is not whether we are convinced beyond a reasonable doubt but rather whether the State has met its burden of production. *State v. Henjum*, 136 Wn. App. 807, 810, 150 P.3d 1170 (2007). We ask whether the State has produced sufficient evidence, which, if believed, satisfies the elements of the crime charged. *Id.*

¶38 The State had to introduce evidence that the defendants owned, possessed, kept, bred, trained, bought, or sold a dog "with the intent that the animal shall be engaged in an exhibition of fighting with another animal."

RCW 16.52.117(1)(a), (4). And the State offered evidence on each element of the animal fighting offense. The State showed the jury numerous items collected from the property. A qualified expert witness opined that the items taken together suggest a dogfighting operation. Given this evidence and evidence of the dogs' injuries, a jury could reasonably have concluded that the defendants here intended to use these dogs to fight other dogs for exhibition.

¶39 It is a misdemeanor for anyone to operate a private kennel without a license from the Spokane County Regional Animal Protection Service and without meeting the standards outlined in Spokane County Code (SCC) 5.04.043(d). The requirements of section 5.04.043(d)(1) include, among others, that the animals have an adequate supply of drinking water, adequate shelter, and medical attention. If the animals have enclosures, they must be clean and sanitary, and their cages must be of adequate size. SCC 5.04.043(d)(3), (6). A "private kennel" exists where between five and eight dogs are kept on premises in Spokane County for personal or noncommercial purposes. SCC 5.04.020.

¶40 Again, a rational fact finder could have found that these defendants operated an unlicensed private kennel. Officer Montano testified that there was no kennel licensed at the East Utah Avenue address. She saw eight dogs on the property. And two of the dogs appeared to have no water. The doghouses were poorly constructed, had large cracks, and provided little protection for the dogs. And several of the dogs were in poor condition.

¶41 The State produced sufficient evidence to support the elements of the crimes of animal fighting and operating an unlicensed private kennel.

ADMISSION OF EVIDENCE OF TATTOOS DEPICTING DOGFIGHTING

¶42 The trial court has discretion to admit or exclude relevant evidence. *Swan*, 114 Wn.2d at 658. And we review those decisions for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 869, 83 P.3d 970 (2004).

¶43 Mr. Nelson asserts only that the State's evidence, other than the tattoo, was all innocuous. So the tattoo evidence must have been influential. But, again, other evidence supports Mr. Nelson's convictions.

¶44 Moreover, the evidence of tattoos was relevant because other animal fighting investigations have demonstrated that having a tattoo depicting dogs fighting makes it more likely that one is connected to an animal fighting operation. And Mr. Nelson may offer evidence of benign reasons for getting a dog tattoo, just as he did for possessing dogfighting magazines and other physical evidence offered by the State.

¶45 The trial court's reasons for admitting the tattoo evidence are tenable. And so the judge did not abuse her discretion. *State v. Bowman*, 36 Wn. App. 798, 808, 678 P.2d 1273 (1984).

PROBABLE CAUSE—SEARCH WARRANT

¶46 Mr. Nelson next argues that there was no probable cause to search other than for the misdemeanor of operating a "private kennel." And the affidavit, stating that there were more dogs in the yard than are allowed without a private kennel license, does not support a search inside the residence or vehicles or of Mr. Nelson's person.

¶47 A magistrate may issue a search warrant only upon a showing of probable cause. *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). Probable cause requires "facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." *Id.* We review the magistrate's probable cause determination and decision to issue the warrant for abuse of discretion. *State v. Smith*, 93 Wn.2d 329, 352, 610 P.2d 869 (1980). So where an investigating officer properly seeks a search warrant and a judge issues the warrant after determining that the application establishes probable cause to search, any "[d]oubts should be resolved in favor of the validity of the warrant" on

appeal. *State v. Garcia*, 63 Wn. App. 868, 871, 824 P.2d 1220 (1992). The trial court's assessment of probable cause, however, is an issue of law that we review de novo. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

¶48 Mr. Nelson contends that the search warrant here was issued without probable cause because the affiant relied on anonymous informants without demonstrating the basis for their allegations or their reliability. He argues in the alternative that the officers improperly executed the warrant by exceeding its scope. However, the officer's affidavit provided sufficient information to link the East Utah Avenue premises and Mr. Nelson to the crimes to support a finding of probable cause. And the search did not exceed the scope authorized by the warrant.

¶49 The affidavit here sets forth specific facts supporting a suspicion that Mr. Renteria and/or Mr. Nelson were involved in animal fighting as well as maintaining a private kennel without a license. And the affidavit sets out the basis for the two citizen informants' allegations and provides information supporting the informants' credibility and reliability. CP (Nelson) at 19-20; *State v. Jackson*, 102 Wn.2d 432, 435-36, 688 P.2d 136 (1984).

¶50 The affidavit makes clear that the two informants are neighbors, both without criminal records. Both visited the property and saw Mr. Nelson's residence and backyard.

¶51 And the scope of the warrant was supported by the nature of the crimes prompting the search. The affidavit includes information that the dogs were beaten with pipes and trained or groomed for fighting. CP (Nelson) at 19-22. Items such as pipes and training paraphernalia could have been in a residence, a vehicle, or on a person on the premises.

¶52 There was no abuse of discretion in issuing the warrant; nor did the trial court err in declining to suppress the evidence gathered during the warrant's execution.

¶53 We affirm Mr. Renteria's and Mr. Nelson's convictions for animal fighting and operating an unlicensed private kennel.

KULIK, A.C.J., and BROWN, J., concur.

Review denied at 168 Wn.2d 1028 (2010).