[No. 47118-0-I. Division One. September 16, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. ALVIN EUGENE WILLIS, *Appellant*.

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Deborah A. Dwyer, Deputy*, for respondent.

ELLINGTON, J. — Expert testimony is admissible so long as the witness has proper qualifications, relies on generally accepted theories, and the proffered testimony is helpful to the trier of fact. Alvin Willis sought to present testimony regarding the propriety and effect of specific interviewing techniques on children in sex abuse cases. In this particular case, the proffered testimony would not have been helpful. We therefore affirm Alvin Willis' convictions for two counts of first degree rape of a child. We address other issues in the unpublished part of this opinion.

## FACTS

C.B. was five years old in 1999. She lived with her mother, Cori, who was dating Alvin Willis. C.B. often slept in her mother's bed with her mother and Willis. When C.B. spent the weekend with her father, Dwain, she asked him to make Willis stop having sex with her. Dwain told Cori, who confronted Willis and asked him if C.B.'s allegations were true. He answered, "I don't think so."[1] When Cori asked him to clarify, he said that he had had difficulty waking C.B. in time for school on Friday, so he began licking and kissing her toes and stomach, and tickling her; Willis suggested she was mad about this. Willis also told Cori to "tell [C.B.] I'm

---

[1] Report of Proceedings (RP) (May 2, 2000) at 149.

sorry and I'll never do it again."[2] In the past, Cori had awakened to see Willis kissing C.B. repeatedly on the mouth.

Dwain's friend Kelli Doran was with him when C.B. first disclosed that Willis abused her. Kelli saw C.B. put two Barbie dolls together face to face and say, "This is my mom and Alvin having sex."[3] C.B. then said, "I have sex with Alvin. . . . I mean, Alvin has sex with me."[4] C.B. said that Alvin kissed her and indicated where by touching her vagina. C.B. told Dwain that Willis had sex with her. She also told him Willis kissed her "there," pointing to her vagina and sticking out her tongue.

C.B. repeated these and similar statements to Dr. Rebecca Wiester, a pediatrician with training in treating sexually abused children. She told Dr. Wiester that Willis had taken her hand when she was "all naked" and placed it on his penis, and that "a little bit of pee" came out.[5] During the course of this interview, C.B. also told Dr. Wiester that she "used to suck the pee out" of her father's penis.[6]

The State charged Willis with two counts of first degree rape of a child. During discovery, Willis learned that Cori had accused Dwain of sexually abusing C.B. when she was two and one-half years old. Child Protective Services investigated, but found no cause to believe any abuse had occurred. C.B. told Nicole Farrell, a child interviewer with the prosecutor's office, that Willis kissed her with his tongue "right where I go potty," and that "[i]t makes me shiver when he does that."[7] She also said that Willis "licks me in the middle where the hole is. When he's done doing

---

[2] RP (May 2, 2000) at 169.

[3] RP (May 2, 2000) at 61.

[4] RP (May 2, 2000) at 63.

[5] RP (May 3, 2000) at 37.

[6] Clerk's Papers (CP) at 86.

[7] RP (May 3, 2000) at 75.

that, it feels like it's time to go potty."[8] Farrell asked what Willis' penis looked like, and C.B. responded, "Sometimes when I do this, it gets straight. And when I let go, it gets wrinkled."[9] When Farrell followed up on the allegation about C.B.'s father, C.B. said that she had touched her father's penis when he was dressing and that he told her, "no."[10] She also said that she had touched it only with her hands and had not seen anything come out of it.

C.B. testified about the abuse at trial. She indicated where Willis touched her by drawing an "X" on the genital area of a large body sketch. When asked what he touched her with, she pointed to her tongue. She also testified that this happened more than once, while she was living with her mom, when she was five years old.

Willis sought to present expert testimony on the effects of specific techniques and protocols in interviewing young children. The court concluded the testimony would not be helpful to the jury and excluded it. On cross-examination, defense counsel questioned Wiester and Farrell about interview techniques and the suggestibility of young children.

The jury convicted Willis of two counts of first degree rape of a child. The court counted Willis' 1987 second degree statutory rape as a strike and sentenced Willis under the Persistent Offender Accountability Act to life imprisonment without the possibility of parole. Willis appealed his conviction and sentence. The verbatim transcript for the final day of trial is missing because the court reporter lost his notes for that day, which included C.B.'s testimony and the closing arguments. The court and the parties, including defense counsel, constructed a narrative report of proceedings for the final day of trial.

---

[8] RP (May 3, 2000) at 76.

[9] RP (May 3, 2000) at 78.

[10] CP at 72.

## DISCUSSION

### *Exclusion of Expert Testimony*

Both the Sixth Amendment and the Washington Constitution, article I, section 22 (amendment 10) guarantee a criminal defendant the right to present witnesses to establish a defense.[11] Willis contends he was denied this right when the court refused to permit his expert to testify regarding techniques for interviewing children about sexual abuse allegations.

Based on *State v. Swan*,[12] the trial court concluded that expert testimony about techniques for interviewing children in sex abuse cases would not be helpful to the jury:

> I think *Swan* is controlling and that the proposed testimony does not satisfy the test for admissibility set forth in ER 702, that the issue of interviewing children and methods of obtaining responses is within the common knowledge of a jury.[13]

■ The trial court's reading of *Swan* is too broad. Expert testimony is admissible when the witness qualifies as an expert, the opinion is based upon an explanatory theory generally recognized in the scientific community, and the testimony would be helpful to the trier of fact.[14] In *Swan*, the defense sought to present testimony about "how a child's memory capacity is affected by age" and about "the factors that create suggestion when an adult interviews a child, such as the adult's expectations."[15] The trial court found, and the supreme court agreed, that the defense had established neither that the witness was qualified to offer the proposed testimony, nor that his opinions were based on

---

[11] *State v. Maupin*, 128 Wn.2d 918, 924, 913 P.2d 808 (1996).

[12] 114 Wn.2d 613, 655, 790 P.2d 610 (1990).

[13] RP (Apr. 12, 2000) at 154-55.

[14] ER 702; *Swan*, 114 Wn.2d at 655.

[15] *Swan*, 114 Wn.2d at 655.

theories accepted in the scientific community.[16] The court also observed as follows: "Moreover, the argument that child interviews could be suggestive was amply aired during the cross examination of the State's witnesses and . . . was well within the understanding of the jury."[17]

■ Here, the defense sought to introduce expert testimony not simply to show that younger children are more susceptible to suggestive and leading questions, but to explain the effects of specific interview techniques and protocols. Such specialized knowledge is not likely within the common experience of the jury. Further, Dr. Yuille possessed bona fide qualifications,[18] and the trial court observed that his theories were generally accepted. *Swan* is therefore not helpful here.

The majority of courts that have considered the issue agree that while an expert may not opine as to the credibility of the child witness, testimony from a qualified expert about proper techniques for interviewing children can be helpful to the jury in evaluating the testimony of interviewers. As one court explained:

> Special interviewing processes are necessary to get information from child victims, who are often immature, inarticulate, frightened, and confused about the abuse they have received. Most jurors lack the knowledge of accepted practices in interviewing child victims, and expert testimony on the issue is therefore admissible.[19]

---

[16] *Swan*, 114 Wn.2d at 656.

[17] *Swan*, 114 Wn.2d at 656.

[18] Dr. Yuille is a forensic psychologist whose specialties include the impact of trauma on human memory and the effect of interview techniques on trauma victims, particularly children. He is a professor of psychology at the University of British Columbia, and has published widely.

[19] *Barlow v. State*, 270 Ga. 54, 507 S.E.2d 416, 418 (1998). *See also United States v. Rouse*, 111 F.3d 561, 571-72 (8th Cir. 1997); *Guam v. McGravey*, 14 F.3d 1344, 1348-49 (9th Cir. 1994); *Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001); *State v. Malarney*, 617 So. 2d 739, 740-41 (Fla. Dist. Ct. App. 1993); *State v. Sloan*, 912 S.W.2d 592, 596-97 (Mo. Ct. App. 1995); *State v. Sargent*, 144 N.H. 103, 738 A.2d 351, 353-54 (1999); *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372, 1384 (1994); *People v. Alvarez*, 159 Misc. 2d 963, 607 N.Y.S.2d 573, 574 (Sup. Ct. 1993);

We agree that the propriety and effect of specific interviewing techniques on children in sex abuse cases may be a proper subject for expert testimony so long as the witness has proper qualifications, relies on generally accepted theories, and the proffered testimony is helpful to the trier of fact.[20]

That said, not all testimony on the subject of techniques for interviewing children will be helpful to the jury. Such is the case here. The defense offered Dr. Yuille's testimony regarding the techniques used in interviewing C.B. While Dr. Yuille stated his opinion that the interviews, especially Nicole Farrell's first interview, were of poor quality because of the use of leading questions and other failings, he testified that without a verbatim report by way of audio or video recording, he could not evaluate the interview techniques. He testified such a recording was "the only way to know how the questions were put to the child, and to get the child's version of the answer."[21]

The only recorded interview with C.B. was an audiotape made by her father, in which Dr. Yuille found nothing of a contaminating or suggestive nature. He stated he could form no opinion about the propriety of Dr. Wiester's interview technique because there was no verbatim transcript. His criticisms of Nicole Farrell's techniques were emphatic, but they depended upon her report format, since there was no verbatim record. Farrell prepared a report in dialogue form, but stated it was "not verbatim." Dr. Yuille criticized both the format, as misleading, and the content, on several grounds. But his criticism of the content depended upon

---

*State v. Gersin*, 76 Ohio St. 3d 491, 668 N.E.2d 486, 487-88 (1996); *State v. Kirschbaum*, 195 Wis. 2d 11, 535 N.W.2d 462, 466-67 (Ct. App. 1995).

[20] We note that witnesses for the State frequently testify based on their experience and training in interviewing children. In this case, the child interviewer from the prosecutor's office described her specialized training in techniques for interviewing children, her work training other interviewers, and her professional memberships. She also described what she considered appropriate interviewing techniques, including the use of a child-friendly interview room, an initial rapport-building phase to the interview, and nonleading questions.

[21] RP (Apr. 12, 2000) at 24.

treating the report as a verbatim record, which it was not. Dr. Yuille identified four questions in the report as leading, and also criticized the absence of detail regarding establishing rapport and truth-telling, and the lack of follow-up questions or long, narrative answers. He acknowledged that most of Farrell's questions were not leading, including those to which C.B. responded by describing Willis' abuse, consistent with all her other disclosures, and that he could not tell from the report what rapport was established, what truth-telling conversation occurred, or why there were not narrative answers.

Despite his criticisms, Dr. Yuille was unable to form an opinion as to the probable results of the defects he identified in the interviews. In addition, Dr. Yuille acknowledged that different experts use different definitions of leading questions in the context of child interviews, and agreed that whatever the definition, leading questions are sometimes unavoidable; that preschoolers are very difficult to interview; and that there are no generally agreed techniques appropriate for all children.

Given this offer of proof, it is difficult to see how the testimony would have aided the trier of fact. While a permanent record of child interviews by justice system professionals would serve several purposes, including that of reducing the number of times the child is exposed to such experiences, the question here is whether Dr. Yuille's testimony would have been helpful despite his stated inability to evaluate interview techniques without a verbatim record. We conclude it would not have been helpful, and that the trial court did not abuse its discretion by excluding it.

Affirmed.

The balance of this opinion has no precedential value and will not be published, but will be filed for public record pursuant to RCW 2.06.040.

BECKER, C.J., and SCHINDLER, J., concur.

Reconsideration granted in part and unpublished portion of opinion amended November 5, 2002.