IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30253-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JACK GLYN JONES, | ) | |
| | ) | |
| Appellant. | ) | |

KULIK, J. — A jury found Jack Glyn Jones guilty of two counts of first degree rape of a child based on incidents involving his granddaughters, J.J. and M.J. On appeal, Mr. Jones challenges the unanimity instruction and asserts he received ineffective assistance of counsel because defense counsel failed to obtain an expert witness to explain the false memory defense. Mr. Jones also filed a statement of additional grounds for review.

We affirm the convictions because we conclude that the court gave a proper unanimity instruction, Mr. Jones's counsel was not ineffective, and the additional grounds for review are without merit.

FACTS

After his first trial ended in a mistrial, a jury found Mr. Jones guilty of two counts of first degree rape of a child involving his granddaughters, J.J. and M.J.

*J.J.'s Testimony.* J.J., who was born on June 9, 1989, testified that between the ages of 5 and 10, she spent her summers with her grandparents in Ephrata. J.J. stopped going to her grandparents because she did not like the way her grandfather touched her.

J.J. testified that during road trips, Mr. Jones would have J.J. touch his penis or he would rub her vagina. J.J. recounted a specific incident when they were driving in Mr. Jones's truck out in the middle of nowhere when a police car started to follow them. Mr. Jones told J.J. not to turn around or attract the officer's attention. During this time, he was having her rub his penis and he was rubbing the inside of her legs and vagina.

J.J. testified that Mr. Jones took a bath with her when she was approximately 7 or 8 years old. Mr. Jones had J.J. sit on his lap while he washed her neck, breasts, stomach, and vagina with a wash cloth. Mr. Jones did not put anything in J.J.'s vagina on this occasion. J.J. told her grandmother about this incident later the same week, but her grandmother thought that J.J. was joking.

J.J. also testified about an incident that took place when her grandmother was out of the house. On this occasion, Mr. Jones laid J.J. on the bed, pulled down her pants, and

2

then performed oral sex on her by putting his tongue and mouth around her vagina, and licking it, and by rubbing her clitoris. J.J. testified that she was around 6 years old when this incident took place.

J.J. testified about another incident in a recreational vehicle when her grandfather stopped his activities because he thought he heard someone coming.

J.J. stopped going to see her grandparents when she was about 10. At that time, she told her Aunt Angel what had been going on. Her aunt told her parents, but they did not believe J.J. when they heard her allegations. J.J. stated that after this time she did not have any contact alone with her grandfather.

J.J. began seeing a counselor in 2008 when she was 18 years old because she was very upset and she did not understand why no one would believe her when she spoke about the molestation committed by her grandfather. The counselor reported the abuse to law enforcement. J.J. was 18 or 19 when she first gave a statement to Detective Dan Bohnet.

J.J. also spoke of the guilt she felt because she failed to prevent what happened to her cousin, M.J. It was not until a couple of years before the 2011 trial that J.J. learned M.J. was alleging that she too had been sexually abused by her grandfather. J.J. indicated

3

that the cousins had had little contact over the years, although they had communicated after the first trial about matters unrelated to the case.

*M.J.'s Testimony.* M.J., who was born on April 16, 1992, testified that she stayed with her grandparents in Ephrata during the summer from the time she was a baby until she was 12 years of age. M.J. testified that she stopped visiting them because of the molestation by her grandfather, which she said happened too many times to count.

M.J. recalled an incident that occurred when she was about 9. M.J. testified that they were driving in her grandparents' truck. M.J. was driving, when her grandfather put his hand down her pants and pushed his finger in and out of her vagina.

M.J. recalled another incident when her grandfather performed oral sex on her after she had come out of the shower. Her grandfather placed her on the bed after closing the blinds, and closing and locking the door.

M.J. testified that after her Aunt Jeanne found M.J.'s diary, Aunt Jeanne repeatedly asked M.J. whether or not she had been sexually abused by her grandfather. M.J. told Aunt Jeanne "no," but after being asked more times than she could count, M.J. told her aunt, and then her mother, about the abuse. M.J. testified that her Aunt Jeanne never told M.J. what to say.

When M.J.'s mother learned about the abuse, she contacted the Ephrata Police Department. M.J., who was 12 at the time, was examined at the sexual assault center at Providence Hospital in Everett by Paula Skomski, a forensic nurse examiner. Ms. Skomski obtained a history from M.J., who told her that this activity had been going on with her grandfather as long as she could remember. M.J. had written a poem in her diary entitled, "She Just Wants to Die." Report of Proceedings (RP) (May 5, 2011) at 231. Ms. Skomski had M.J. sign a safety plan agreeing that she would call someone if she had thoughts about harming or killing herself.

*M.J.'s Mother's Testimony.* M.J.'s mother testified that M.J. began to show a reluctance to visit her grandfather about one year before she learned of M.J.'s allegations. M.J. was interviewed by Detective Dave Matney and a prosecutor in 2004 when the incidents first came to light. M.J. testified that her contact with her cousin, J.J., was sporadic, occurring only when the two of them were in Ephrata. It was not until three or four years prior to the 2011 trial that M.J. learned that J.J. had made similar allegations regarding their grandfather. M.J.'s mother testified that the only time the two girls spent together was when they were at the grandparents' home.

*Verdict.* On May 6, 2011, the jury found Mr. Jones guilty of two counts of first degree rape of a child.

5

ANALYSIS

*To-Convict Instruction.* To ensure jury unanimity in multiple acts cases, the State

must either (1) elect the particular criminal act upon which it will rely for the conviction;

or (2) the trial court must instruct the jury that all of the jurors must agree that the same

underlying criminal act has been proved beyond a reasonable doubt. *State v. Kitchen,* 110

Wn.2d 403, 411, 756 P.2d 105 (1988).

When the State fails to make proper identification of the specific act charged, and

the trial court fails to instruct the jury on unanimity, there is constitutional error. "The

error stems from the possibility that some jurors may have relied on one act or incident

and some another, resulting in a lack of unanimity on all of the elements necessary for a

valid conviction." *Id.*

Mr. Jones asserts the State elected a particular criminal act to form the basis of the

charge of first degree child rape of J.J. However, Mr. Jones also contends that there were

two acts that could have formed the basis of the child rape conviction relating to M.J.

Specifically, Mr. Jones claims the State argued that the incident where Mr. Jones

allegedly put his finger in M.J.'s vagina constituted intercourse and that a second act

could have formed the basis for the same charge—the 2002 incident where he allegedly

performed oral sex on M.J.

6

*Election by the State.* The first question is whether the State elected a particular

act upon which it would rely for the conviction. *See id.* Here, Mr. Jones contends that in

closing argument, the State elected the particular criminal act of first degree rape by

describing the incident where Mr. Jones allegedly put his finger in M.J.'s vagina when

she was 9 years old. Mr. Jones maintains that the State relied on this particular act to

prove intercourse.

To support his argument, Mr. Jones relies on the portion of the State's closing

where the deputy prosecutor argued that instruction 10, the to-convict instruction for the

first degree child rape of M.J., does not specify the act forming the basis for the charge.

The State argued:

> You heard from [M.J.], the same thing, [M.J.] loved her
> grandparents. She told you about an incident in 2008 when they were in the
> truck, the defendant was driving, they were about 20 minutes from the
> house, the defendant grabbed her hand and had the victim squeeze his penis.
> *That's molestation, ladies and gentlemen.*
> She told you about an act when she was nine years old when she was
> driving, her stepbrother was in the truck, the defendant was between the
> two of them, leaned forward, and put his finger in her vagina and moved it
> in and out. *And that's intercourse.*
> She told you about an incident in 2002 when she was ten, when she
> came out of the shower, the defendant locked—closed and locked the door,
> closed the blinds, put her legs up, . . . licked and kissed her vagina. And she
> was scared.

RP (May 6, 2011) at 378-79 (emphasis added).

7

Based on this argument, Mr. Jones claims the State elected the particular criminal act of first degree rape against J.J. According to Mr. Jones, the State relied only on the incident where Mr. Jones allegedly put his finger in M.J.'s vagina to prove intercourse between Mr. Jones and J.J.

The State points out that there is no support for Mr. Jones's argument that the State made an election of one act of intercourse over another. In the State's view, such election must be accomplished through amendment of the information. Here, the information had not been amended and Mr. Jones was charged with having committed the act of rape of a child in the first degree or, in the alternative, child molestation in the first degree for each of the two victims with an allegation that the unlawful conduct spanned a number of years.

Because the State did not make an election between multiple acts, we must examine the adequacy of the court's instructions.

*Jury Instructions.* In *State v. Petrich*, 101 Wn.2d 566, 572-73, 683 P.2d 173 (1984), a multiple acts case, the Washington Supreme Court overturned Mr. Petrich's convictions because the State should have been required to elect the act(s) upon which it was relying for conviction or, in the alternative, that the jury should have been instructed that all 12 of them were required to agree that the same underlying criminal conduct had

8

No. 30253-9-III
*State v. Jones*

been proved beyond a reasonable doubt. This type of jury instruction is known as a

*Petrich* instruction. *See, e.g.,* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY

INSTRUCTIONS: CRIMINAL 4.25, at 110 (3d ed. 2008) (WPIC).

Mr. Jones contends that a *Petrich* instruction was needed because the State relied

on two different acts to establish first degree child rape. He maintains the trial court erred

by giving instruction 10, the to-convict instruction for the first degree rape of M.J. In Mr.

Jones's view, instruction 10 did not specify the act forming the basis of the charge.

Instruction 10 reads:

> To convict the defendant of the crime of rape of a child in the first
> degree as charged in count three, each of the following elements of the
> crime must be proved beyond a reasonable doubt:
> (1) *That on or between April 16, 1997, to April 15, 2004,* the
> defendant had sexual intercourse with M.J., dob 4/16/92;
> (2) That M.J., dob 4/16/92 was less than twelve years old at the time
> of the sexual intercourse and was not married to the defendant;
> (3) That M.J., dob 4/16/92 was at least twenty-four months younger
> than the defendant; and
> (4) That this act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been
> proved beyond a reasonable doubt, then it will be your duty to return a
> verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a
> reasonable doubt as to any one of these elements, then it will be your duty
> to return a verdict of not guilty.

Clerk's Papers (CP) at 216 (emphasis added).

9

Instruction 10 does not specify the act forming the basis for the charge. Instead, the instruction gave a time frame between April 16, 1997, and April 15, 2004, when the act of intercourse allegedly occurred. Although defense counsel raised no exception to instruction 10, the issue may be raised for the first time on appeal because the failure to provide a unanimity instruction in cases with multiple acts can be manifest constitutional error. *State v. Kiser*, 87 Wn. App. 126, 129, 940 P.2d 308 (1997).

Mr. Jones relies on instruction 10, the to-convict instruction, but this court must examine the *Petrich* instruction that was given, instruction 7. Significantly, instruction 7 is based on WPIC 4.25, which is described as "Jury Unanimity—Several Distinct Criminal Acts—*Petrich* Instruction." WPIC 4.25 reads as follows:

> The [State] [County] [City] alleges that the defendant committed acts of _____ on multiple occasions. To convict the defendant [on any count] of _____, one particular act of _____ must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of _____. [The blanks are for the indentified crime.]

Jury instruction 7 reads, in part, as follows:

> The State alleges that the defendant committed acts of rape of a child in the first degree or in the alternative, child molestation in the first degree involving M.J. on multiple occasions in counts 3, and 4. To convict the defendant of rape of a child in the first degree or in the alternative, child molestation in the first degree in counts 3 and 4, *one particular act of rape of a child in the first degree or in the alternative, one particular act of child*

> *molestation in the first degree must be proved beyond a reasonable doubt,
> and you must unanimously agree as to which act has been proved.* You
> need not unanimously agree that the defendant committed all the acts of
> rape of a child in the first degree or in the alternative, child molestation in
> the first degree.

CP at 213 (emphasis added).

Generally, a unanimity instruction will cure the failure of the State to elect a particular act. *See State v. Vander Houwen*, 163 Wn.2d 25, 38, 177 P.3d 93 (2008). Here, the jury heard testimony regarding multiple acts and was appropriately presented with a *Petrich* unanimity instruction.

Examining the record here, we conclude that the court gave a proper *Petrich* instruction to the jury. The instruction required the jury to "unanimously agree as to which act has been proved."

*Ineffective Assistance of Counsel.* Mr. Jones asserts that trial counsel's performance was ineffective because he failed to secure an expert witness to support the defense's theory that multiple interviews of J.J. and M.J. created false memories of the alleged abuse.

To prove ineffective assistance of counsel, a defendant must show by a preponderance of the evidence that his counsel's performance was objectively unreasonable and that the deficient performance prejudiced him. *Strickland v.*

*Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A reviewing court is not required to address both prongs of the test if the appellant makes an insufficient showing on one prong of the test. *Id.* at 697.

In *State v. Willis*, 151 Wn.2d 255, 87 P.3d 1164 (2004), the court held that the admissibility of an expert regarding the use of child witnesses was not an abuse of discretion. In *Willis*, the court followed its conclusion in *State v. Swan*, 114 Wn.2d 613, 656, 790 P.2d 610 (1990), that the fact that younger children were more susceptible to suggestion was well within the understanding of the jury. *Willis*, 151 Wn.2d at 261. But *Willis* also acknowledges that in sexual abuse cases, specialized knowledge regarding the effects of specific interviewing techniques and protocols in sexual abuse cases would not be within the common experience of a jury. *Id.* (quoting *State v. Willis*, 113 Wn. App. 389, 394, 54 P.3d 184 (2002), *rev'd in part by* 151 Wn.2d 255). *Willis* concluded that the trial court did not abuse its discretion by excluding the expert testimony because the witness was highly equivocal and his testimony would not help the trier of fact given the consistent assertions made by the child. *Id.* at 264.

In *State v. Downing*, 151 Wn.2d 265, 274, 87 P.3d 1169 (2004), the trial court applied the abuse of discretion standard and the due process standard to the trial court's denial of a continuance. The motion in question was Mr. Downing's motion for a

continuance in order to obtain expert testimony for the express purpose of reconsidering the trial court's ruling that the victim was competent to testify. The court determined that the trial court did not abuse its discretion by denying the motion. The court also concluded that the trial court's decision did not violate due process. In *Downing*, the court determined that the expert's testimony would not change the fact that the victim's statements before or after the potentially tainting contacts were consistent. *Id.* at 274. Moreover, reconsideration of competency to testify would not likely have led to a different result upon the expert's testimony. *Id.* at 276.

Here, the disclosure of each victim's report of sexual abuse by Mr. Jones came about in different ways. J.J., who had been sexually abused between 1994 and 1999, when she was between the ages of 5 and 10, first disclosed the sexual abuse to her grandmother. This disclosure took place after the incident when J.J. was 7 or 8 and her grandfather had contact with her in the bathtub. According to J.J., her grandmother had not believed her and thought she was joking. J.J. then told her Aunt Angel about the incident. Aunt Angel told J.J.'s parents who also failed to believe her. It was not until 2007, when J.J. was 18 and seeing a counselor, that the report of her abuse was made public, and J.J. spoke to police.

M.J. testified that she first disclosed information about the sexual abuse to her

13

Aunt Jeanne who had repeatedly asked her if her grandfather had sexually abused her. According to M.J., this disclosure occurred when she was about 12 years of age. M.J. did not tell school counselors about the abuse, but she did tell the sexual assault nurse when her mother took her to the hospital in 2004. M.J. testified that her Aunt Jeanne had asked her repeatedly whether her grandfather had abused her, but her Aunt Jeanne had not told her what to say.

Each of the two young women made their disclosure to different adults. They both testified that they were not particularly close to each other while these events were taking place and that they did not learn of each other's abuse by their grandfather until 2007. Even so, the young women testified to very similar scenarios. They each testified to an act involving their grandfather performing oral sex on them after having bathed. Each young woman also testified to inappropriate sexual contact during drives in their grandfather's truck. Both young women were older when they disclosed the information. There were no repeated interviews of either young woman. An expert's testimony explaining the theory of false memory would not have helped the trier of fact. Significantly, Mr. Jones is unable to articulate what this expert could have testified to that would have assisted the jury in this case.

Even if we assume counsel's performance was deficient, Mr. Jones has failed to

14

establish how he was prejudiced when the jury heard similar accounts from two victims who had had little contact with each other and were 12 and 18 at the time of their first interview, and who had been interviewed only a few times by completely different people.

Mr. Jones's claim of ineffective assistance of counsel fails.

*Volunteer Bailiff.* Mr. Jones asserts that David Matney acted as a volunteer bailiff in this matter even though he had previously been employed by the Grant County Sheriff's Office and had interviewed M.J.

The record shows that Mr. Matney was removed as a volunteer bailiff to avoid even the appearance of unfairness.

*Speedy Trial.* Mr. Jones complains that his trial was continued 25 times during a period of almost four years. He asserts that the continuances were based on (1) changes in the personnel of the public defender's office, (2) personnel changes in the prosecutors' office, (3) M.J.'s and J.J.'s vacations, and (4) M.J.'s and J.J.'s illnesses. Mr. Jones contends that he requested his attorney to ask for the charges to be dismissed prior to the grant of each continuance.

Mr. Jones maintains that his speedy trial rights were violated but points to no place in the record where he objected to a continuance. Without greater specificity, this court cannot conclude that a speedy trial violation occurred.

We affirm the convictions for two counts of first degree rape.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Kulik, J.

WE CONCUR:

Brown, J.

Siddoway, A.C.J.

16